## MILLER *v.* MILLER
[No. 9, October Term, 1948.]

*Decided November 11, 1948.*

*Rehearing denied November 19, 1948.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, HENDERSON, and MARKELL, JJ.

*Hyman Ginsberg,* with whom were *Ginsberg & Ginsberg* on the brief, for the appellant.

*Helen Elizabeth Brown* for the appellee.

COLLINS, J., delivered the opinion of the Court.

On October 6, 1947, Harry Miller, Jr., appellee, filed against his wife, Eileen W. Miller, appellant, a bill for a divorce *a mensa et thoro;* for the custody of their child, Joyce Anne Miller, who was born October 4, 1945; and for an injunction restraining her from removing the child, Joyce, from his custody. An answer was filed to that bill by the appellant denying the material allegations therein. On November 7, 1947, the appellant filed a cross-bill praying a divorce *a mensa et thoro,* the care and custody of the child, alimony *pendente lite,* permanent alimony, support for the infant child, counsel fees and costs of suit.

After hearing in open court the chancellor signed a decree granting a divorce *a mensa et thoro* to Harry Miller, Jr., appellee; awarding him the custody of the infant child, with the privilege to the mother to visit the child in the home of the appellee on Saturday afternoons of each week between the hours of 1 P. M. and

5 P. M., subject to further order of the court; and dismissing the cross-bill. From that decree the appellant appeals.

The parties to this suit were married in Baltimore on March 14, 1945. At that time the husband was twenty-six years of age and the wife twenty-five. Her home was in Jamaica, New York. She had attended the University of Alabama for three and one-half years and also had taken courses at Hunter College in New York. He was graduated from high school and has been honorably discharged from the United States Navy. Before entering the Navy he had been employed as a welder.

The parties knew each other about six months prior to marriage. After the marriage the husband and wife left Baltimore so he could attend the University of Tennessee at Nashville under the Act popularly called the "GI Bill of Rights." 38 U. S. C. A. § 693 *et seq.* There they occupied one room with bath at the time the child was born. At birth the child was of normal weight but had "a form of club feet". She developed an abscess, had pneumonia, and lost weight. The appellee was not very successful in his studies at the University. After consulting his father and mother and receiving permission from them to come to their home in Baltimore, the parties to this suit left Tennessee on December 17, 1945, and moved with the baby to the home of the appellee's parents. At his parents' home they had a room for themselves and the baby and food. They paid his parents $15 per week. When the baby arrived in Baltimore she was sickly and very thin. A doctor was called and the child was found to be far from well. Her health improved materially while in the home of her paternal grandparents. The husband obtained a position driving a Yellow Cab which paid him between $45 and $55 a week.

In June, 1947, in addition to driving the taxicab he started a course in an automobile mechanics school, also under the "GI Bill of Rights". The wife admitted that in the appellee's parents' home she was always treated "very nice". She further said: "I guess I did not act

grateful, because I did not feel grateful". She wanted a home of her own. She admits that the child became fat and healthy there. She says that her mother-in-law "loved" to take care of the baby.

The wife obtained a position with the Social Security Organization in June, 1947, at a salary of about $32 per week. She worked from 4 P. M. until 12:30 A. M. After working she went out with employees of the office and often did not return home until two or three o'clock in the morning. While working with the Social Security she became acquainted with a man, Henry E. Yanus, who worked there, and who would take her to taverns where they would drink and eat until about two o'clock in the morning when the taverns closed. Her husband seriously objected to this association with Yanus. The husband testified that his wife often came home intoxicated. Yanus testified that he drank with her several evenings after work.

The husband testified that he made every effort to locate an apartment but was unable to do so. The rent was either too high or the places found were not suitable for his wife and baby. He went to the Baltimore Housing Authority, answered advertisements in the newspapers, and made an application for a "GI loan" to buy a home. Apparently the wife made little effort to find another place to live. She said that she told her husband about a week before September 12, 1947, that she was "tired" of staying with his parents and that she was going to leave.

On Friday night, September 12, 1947, the appellant came home from work about 3 A. M. and found the screen door locked. Her father-in-law testified that unfortunately when he went to bed the front door was open and the screen door was latched. He left the light lit and closed the front door but forgot to unlatch the screen. He said the next morning, before he left to go to work, he joked with Eileen about this and she knew that he did not intentionally lock her out.

The appellant testified that without her husband's knowledge she resigned her position about September 10, 1947, and left the Social Security on September 12th. That night after work, because it was her last night there, some of the employees took her to a tavern. At the party the employees gave her a gift. When she reached home about 2:30 A. M. the screen door was locked and she did not want to make a disturbance. The door bell was between the screen door and the big door. She went to a neighbor's house and spent the night. The next morning she returned home, packed a suitcase with some of the baby's and her clothes and carried the suitcase to the neighbor's house. No one in the Miller family saw her do this or knew she was planning to leave. She told her husband that morning that she intended to take the baby to see some friends for lunch, and she would meet him home about three o'clock and they would go to the "movies" that evening. About 12 o'clock that day she left the house with the baby and with a paper bag, without any of the Miller family seeing her, and went to the neighbor's house where she picked up her suitcase, called a taxicab, stopped for Henry Yanus and went with him to the railroad station and she took the train to New York. Yanus did not go to New York with her. Yanus testified that she had previously told him she was making plans to leave for New York and was packing "on the sly so no one could see it so she could sneak off that morning." * * * "She said she was going to New York to stay." That afternoon she called her husband on the telephone and said: "Surprise, I am in New York." She said she did not tell him before because she thought he would prevent her leaving. She admitted that her husband gave her no cause to leave and she left because he did not "make her happy." He said that in the telephone conversation she told him she was going to stay in New York and keep the baby. He also said she told him: "not to bother to come there to see the baby because her father wouldn't let me near the house". He was very surprised about this. He called his wife

again the same day and arranged to meet her at New York the next day, September 14, 1947. She met him at the subway station. The wife testified that she wanted her husband to get a position in New York. She admitted, however, that when he came up to see her he had no idea of getting a position at that time because he was supposed to finish the mechanical school first. She said she was definitely through with him and intended to keep the baby. He saw Joyce at her parents' home for a few minutes. He says her parents' home is a small four room row house and her father does not like children and her mother thinks the baby would be too much trouble for her.

The appellee testified further that while he was in New York that Sunday his wife told him when she and his mother were in New York the previous Labor Day, she talked with her father and mother about leaving him and her father was in full accord. While he was there on September 14, 1947, he said his wife told him: "If I wanted to get the things started again, and I wanted to prove to her father that I was the right type, and all like that, why not write some letters, go all out, so that her father could read them and see that I was trying to do the right thing, and so forth, for her. So I went home and I went all out." He wrote her two letters in order to "smooth things over and help her to come back on the baby's birthday." In one of the letters he wrote to her he stated he was glad that he was going to get another chance with her.

The appellee returned to New York the following Saturday, went to the appellant's parents' home, found the grandmother in the house, and the two year old child playing in the dirt in the street in front of the house and sitting on the curbstone near "traffic." The appellant was attending a moving picture show. The appellee objected to the child being outside in the street, playing in the dirt, without supervision.

On October 4th, the child's birthday, as a result of letters written by the husband and with money sent by

him, the wife, who was then employed as a telephone operator in New York, brought the child to Baltimore to spend the birthday with her paternal grandparents. She definitely stated in her testimony that she came only for the purpose of the birthday and she had no intention of staying in Baltimore. She said when she left in September she did not intend to come back and the reason she came down on October 4th was because of the birthday. She arrived in Baltimore about 9 P. M. October 3rd and went to the home of the appellee's parents. Witnesses testified that the child did not look well at that time. The baby was delighted to be at her paternal grandparents' home again. The next morning the appellant packed her clothes in a suitcase and took it to the station to ship to New York. Also that morning she called Henry Yanus on the telephone, told him she had just returned from New York, made arrangements to meet him that day on North Avenue and get a ticket from him for a Social Security dance that night. She left the house that morning about 10 o'clock and came back about noon. She then told her husband she was going to the dance that night. Her husband said he offered to go with her but she said she would not enjoy herself if he were there.

The birthday party was held for the child between five and six P. M. The appellant then went upstairs, dressed and came down about seven o'clock and said she was ready to go to the dance. Theodore Taylor, who was also visiting at the home, and her husband tried to persuade her not to go, particularly as it was the child's birthday. They wanted her to go to the "movies" with them. Taylor offered her $10.00 for the ticket but the appellant replied that it was worth more than $10.00 to her. The husband and Taylor walked about six blocks with her trying to persuade her not to go but she insisted, called a taxicab, and that was the last they saw of her that night. Yanus said he met her at the dance and sent her home afterwards.

The appellant testified she knew her husband did not like dances. He had gone to one with her previously but she did not want him to go "if he did not have a good time". The husband refused to go and the wife admits that he told her if she went he would lock her out, but she did not believe him. She said before they were married they never went to dances together but used "to go for walks and to the movies". She said she returned home about 2:30 A. M. and the door was locked. She stayed with the same neighbor with whom she had stayed previously, returned home about 6:30 A. M. and rapped on the door. Her husband told her he would not let her in and she could not have the baby. She said she was upset, "extremely wild looking" but wanted the child. She kept rapping on the door but could not get in. She then called the police who asked her husband to give up the baby, which he refused to do. Although she claims she made several other trips to the house and stated that she would return and stay with him, he refused to let her come back.

The husband filed the bill of complaint on October 6, 1947, the following Monday. The appellant later employed an attorney and through arrangements made by the attorneys she was permitted to see the child every Sunday. At the time of the hearing in this case she had resumed her position at the Social Security and wanted the child. She boarded with a woman in Towson. She said she could work and she and her child could board with this woman, who would take care of the baby. The woman with whom she boarded had grown children of her own.

In this case there is no doubt that the appellant deserted the appellee on September 13, 1947, when she took the child and moved to her parents' home in New York. She admits she had no intention of returning to Baltimore. "Abandonment" as a ground for divorce, within the meaning of the statute, has been many times defined by this Court. Two affirmative elements must be proven. First, the ending of cohabitation and, second, the offend-

ing party's intention to desert. *Lynch v. Lynch,* 33 Md. 328; *Taylor v. Taylor,* 112 Md. 666, 77 A. 133; *Klein v. Klein,* 146 Md. 27, 125 A. 728; *Crumlick v. Crumlick,* 164 Md. 381, 165 A. 189; *Boyd v. Boyd,* 177 Md. 687, 11 A. 2d 461; *Dunnigan v. Dunnigan,* 182 Md. 47, 31 A. 2d 634. There is no doubt of proof that the wife's action in this case constituted those two elements.

Appellant, however, relies strongly on the case of *Fischer v. Fischer,* 182 Md. 281, 34 A. 2d 455. In that case the husband compelled his wife to live with her mother-in-law, in an ill-kept home, where she was treated as a boarder, and where the mother-in-law was in absolute charge. The two women were not congenial. The husband was "amply able to support his mother and to provide a separate home for her, or to get another home for his wife and in fact admitted that he could." However, he made no attempt to provide his wife with a separate home and in that case we held that his wife was justified in leaving her husband. As pointed out in the case of *Hoffhines v. Hoffhines,* 146 Md. 350, 126 A. 112, 38 A. L. R. 332, one of the strong incentives of marriage is the establishment of an independent home and this instinctive desire should be encouraged. The facts in the instant case are quite different, however, from those in *Fischer v. Fischer, supra.* Here the wife gladly went to live with her husband's father and mother at a time when her child was ill. She admits she was treated very well in that home but that she was not grateful for this treatment. Although she wanted a separate home she apparently made no serious effort to locate one, although she was in Baltimore unemployed from December, 1945, to June, 1947, and her mother-in-law cared for the baby during her absences from home. The husband, from the testimony, tried to locate an apartment but was unsuccessful. We must take judicial notice of the fact that at that time it was very difficult to rent any suitable habitation at any reasonable price. The husband worked, made a small salary, and tried to improve himself by attending school outside of working hours. She admits

the only reason she deserted her husband was because she was not happy, in the same home with his parents, where she was well treated.

As to her contention that her husband should have moved to New York and obtained a position where she wanted to live, it was not her right to legally change the matrimonial domicile. A husband is not required to maintain a home elsewhere if it is not practicable for him to do so. The difficulties must be grave if the wife, without sufficient justification, leaves a home properly maintained by him with his parents. *Hoffhines v. Hoffhines, supra; Buckner v. Buckner,* 118 Md. 101, 84 A. 156, Ann. Cas. 1914B, 628; *Ewing v. Ewing,* 154 Md. 84. The husband had no position in New York. He was attending school in Baltimore to improve himself for a better occupation. In fact, the appellant told him, when he was in New York on September 14th, that she wanted him to come to New York to live, when he finished school and "maybe I can find an apartment before you finish school". The mere fact that the wife desired to live in New York in a separate home did not justify her desertion.

She further claims that after the separation she offered to return and live with her husband, but he refused her offer. It has been frequently stated by this Court that, if one spouse leaves the other without just cause, as we find happened in this case, and repents and proposes to renew the cohabitation, and the other spouse refuses, it **constitutes desertion by the one refusing** from the time **of the refusal,** provided the offer to return is made in **good faith and is free** from improper qualifications and conditions, and is really intended to be carried out in accordance with the performance of the duties and obligations of matrimonial cohabitation. *Wise v. Wise,* 159 Md. 596, 600, 152 A. 230; *Simmont v. Simmont,* 160 Md. 422, 432, 153 A. 665; *McClees v. McClees,* 162 Md. 70, 74, 75, 158 A. 349; *Pitts v. Pitts,* 181 Md. 182, 190, 29 A. 2d 300; *Zukerberg v. Zukerberg,* 188 Md. 428, 433-434, 53 A. 2d 20, 22. Without repeating the testi-

mony herein before set forth it is evident that the offer by the appellant to return to her husband was not made in good faith. It appears that the only reason she wanted to return to the husband's domicile was for the purpose of being with her child.

The question as to the custody of the child gives this Court more concern. The father and mother are joint natural guardians of their minor children and have equal powers and duties and neither parent has any right superior to the right of the other concerning the custody of their children. Acts of 1929, Chapter 561, Section 1, Code, Article 72A, Section 1; *Yost v. Yost,* 172 Md. 128, 133, 190 A. 753. The paramount consideration of the Court in awarding custody of children, in divorce cases, is confined to the question of what will be to the best interests of children and most conducive to their welfare. Accordingly the courts will exercise sound discretion and award the custody of children according to the exigencies of each particular case. The welfare of the children is the court's main consideration. *Carter v. Carter,* 156 Md. 500, 505, 144 A. 490; *Dunnigan v. Dunnigan, supra,* 182 Md. pages 51, 52, 31 A. 2d 634.

This Court must determine from the facts before us whether the welfare of this child, now three years of age, will be best preserved in the custody of the mother, who will keep her in a rented room under the care and custody, in the daytime, of a stranger to that child; or whether the custody should be awarded the father who lives in the home of the paternal grandparents, where, from all the evidence, the baby is well, happy, and receiving all necessary care, and where nothing is to be desired except the companionship of its young mother. The grandfather, Harry E. Miller, Sr., is employed as a disbursing officer at the Bartlett-Hayward Plant in Baltimore. The home in which the grandparents live has been their home for seventeen years. The house has five rooms on the first floor and three on the second. The mother, who now seeks to remove the child from that house, admits that its paternal grandparents love the baby and

give it excellent care. As long as the child has remained in that home she has been well and happy.

On the other hand, it is undoubtedly true that under ordinary circumstances the welfare of a very young child is better preserved by awarding custody to the mother. We must look to the future welfare of this infant. In making our decision we should not gamble about that future. We can only judge the future by the past. The evidence undoubtedly shows that while the child was under the sole care of its mother in Tennessee it was far from well and lost weight. The health of the child was the primary reason why the parties to this suit left Tennessee and moved to the home of the paternal grandparents. After the child was taken to New York we find the child, then not two years old, without supervision, alone in the street playing in the dirt near traffic, while the mother attended a moving picture show. There is also evidence that when the child came back to Baltimore on October 3, 1947, her health was not as good as when she left in September.

We have nothing here to convince us, if the child is awarded to the mother, conditions will be different than during the other two periods when she was under the care of the appellant. We should not, to satisfy the natural and commendable maternal instincts of the mother, risk removing this very young child from a home where she is receiving excellent care, love and affection and place it with a mother, who in the past, has not been successful in the care of that infant, and who must leave the care of the child to a stranger during much of the time. At times in the past the maternal instinct of this mother seems to have been overshadowed by other diversions. As was said in *Carter v. Carter, supra,* 156 Md. at page 506, 144 A. at page 492: "So far as the child's welfare is concerned, the Court can find no ground to award his custody to the mother except to gratify her maternal love." *Atkins v. Gose,* 189 Md. 542, 56 A. 2d 697. The chancellor had the atmosphere of the trial. He had the opportunity of observing the appearance and

demeanor of the witnesses and of observing the mother, father, paternal and maternal grandparents during this strenuously contested case. *Collins v. Collins,* 184 Md. 655, 42 A. 2d 680. As was said in that case in 184 Md. at pages 663 and 664, 42 A. 2d at page 684: "* * * this is a case in which the atmosphere of the trial—the appearance and demeanor of the witnesses and their manner of testifying—is invaluable in reaching a correct and just conclusion. The lower court had this atmosphere. * * * If the record left us in doubt, we should not disturb the findings of fact."

In the decree, as above stated, the chancellor allowed the appellant to visit Joyce every Saturday afternoon between the hours of 1 P. M. and 5 P. M. During the argument in this Court it was intimated that when the mother visited the child someone else always remained in the room. No doubt the chancellor by this order meant that the mother should see the child alone if she desired in the home of Harry E. Miller, Jr. at the specified hours on Saturdays. This award of custody, is, of course, subject to the further order of the chancellor. The decree will be affirmed.

> *Decree affirmed, costs to be paid by the appellee.*

MARKELL, J., filed the following dissenting opinion:

As is apparent, and was stated at the argument by the husband's counsel, this was a "forced marriage." The baby was not the result, but the cause, of the marriage. Affection, if any, between husband and wife, soon cooled in the drab life in Tennessee, in cramped quarters, with a sickly baby, without money and without marked ability or industry on the husband's part. He has a more than Adamlike propensity for blaming on his wife not only his shortcomings but also his misfortunes and even his statements in letters to her. He says the baby was not properly cared for by his wife, because had it been properly cared for it would have grown like a normal

child and taken on weight. Beyond this syllogism there is no evidence of lack of care of the child and Judge Mason finds the charge "overdrawn and unimportant". From Tennessee they fled to, and doubtless imposed upon, his parents. He paid only a nominal "board" for his family; she did not overwork about the house, but permitted the grandmother to enjoy the baby's society and also to take over to a considerable extent the unpleasant incidents of caring for a baby. The baby soon improved, not through the grandmother's care, but through medical care and advice, as to nutrition, which had not been received in Tennessee. Before the departure for New York, the wife got employment with the Social Security administration, and the husband gave up his job for several weeks to look for a better one.

This Court has repeatedly held that divorces, including divorces *a mensa*, should not be granted for light or trivial causes. Desertion, especially a short separation, ordinarily is not irrevocable but calls for reasonable efforts on both sides toward reconciliation. An unannounced visit by a wife to her parents is not *per se* desertion. *Cf. Coleman v. Coleman*, 188 Md. 203, 208, 51 A. 2d 673, 675. Even if the wife, when she took the baby to New York in September, did not intend to return, the fact is she did return in three weeks for the baby's birthday. While she was in New York, her husband wrote her: "I am so very happy that I am going to get another chance. I promise you will not regret it." His explanation of this letter is too flimsy to bear handling. Even if she intended to return to New York with the baby, the fact is she did not return but was locked out of the house by her husband and her baby kept from her. Such treatment naturally aroused the fury of a woman scorned and did nothing to rekindle the embers of dead or dying affection.

Going to the dance did not outrage the husband's sense of propriety. The event suggests that he was glad to find a pretext for locking her out and snatching her baby from her. He does not like dancing and does not dance

well. To many young, or not so young, persons dancing is a necessity. Going to a dance without one's husband is not conventional but is not rare. In mid-Victorian days it was not unheard of and did not constitute desertion or evidence of adultery. It does not justify a lock-out. Nor does a lock-out constitute desertion by the one locked out.

I think neither the husband nor the wife is entitled to a divorce and both the bill and the cross-bill should be dismissed, except as to custody of the child.

However, in this case the question of divorce is relatively unimportant in comparison with the matter of custody of the child. Of course, the paramount consideration is the best interests of the child. But unless the mother is definitely unfit, ordinarily the first interest of a child of tender years, especially a girl, is to receive its mother's care and attention. *Cf. Schneider v. Hasson,* 161 Md. 547, 550, 157 A. 739. When a husband obtains a divorce for desertion, custody of a young child is seldom denied to the wife. *Cf. McCann v. McCann,* 167 Md. 167, 171, 172, 173 A. 7. In most cases in which the wife has been denied custody she has been guilty of adultery and in many was still living in adultery. *Swoyer v. Swoyer,* 157 Md. 18, 145 A. 190, and dissenting opinion; *Pekar v. Pekar,* 188 Md. 360, 52 A. 2d 468.

In the instant case the mother apparently was never away from her baby for a day until, thirty-six hours before the bill was filed, she was locked out by her husband. The principal reasons urged for denying her custody are that she is employed outside the home and sometimes goes out at night. A hundred years ago women who spent "long days of labor" in factories were not legally unfit for custody of their children. Today a forty-hour, or shorter, week, and the still shorter hours of part-time employment, leave more free time to be with a child. Day nurseries, children's playgrounds and other social agencies give attention to children while their mothers are employed outside the home. The placid home life reflected in Whistler's portrait of his "Mother" is an irre-

parable loss of recent generations. Certainly mothers—or greatgrandmothers—do not now exemplify it. Infant mortality, however has been overcome, not by mothers of the Whistler era, but by modern medicine. Moreover, even a Whistler mother would not be capable (*a*) of giving a young grandchild the warm young affection it is entitled to received from its mother or (*b*) of coping with modern adolescence, which follows babyhood by only a short span of years. Practically all mothers—and fathers—married, widowed, separated, divorced or remarried, more or less frequently go out at night and leave their children with professional (but untrained) "baby-sitters" or with grandmothers, who either gladly or reluctantly usually accept the role of unpaid baby-sitter. If, on the facts of this case, the mother is to be denied the custody of her baby, then "emancipated woman" who has outside employment (as millions have) or goes out at night (as every one does) has shaken off the tyranny of a husband's dominion at common law, only to become subject to a worse tyranny of living in fear of a husband or former husband snatching, or threatening to snatch, her baby from her. A weekly four-hour visit of mother to child, in a hostile home, can only keep both mother and child emotionally upset and intensify hostility between mother and grandparents.

The mother, in this case, so far from having demonstrated her unfitness, appears to be superior to the father in education and initiative. She has established herself in Baltimore and seems able to fend for herself, particularly if she receives from her husband an allowance for the support of the child. I think custody should be awarded to her, subject to the continuing jurisdiction of the Court, with the right to the father to see the child—not restricted as is the mother's right under the present decree to a few hours each week in the presence of others—and to have her visit in his parents' home for reasonable periods.

HENDERSON, J., concurs in this opinion.