# McCABE v. McCABE

[No. 61, September Term, 1958.]

*Decided December 19, 1958.*

The cause was argued before BRUNE, C. J., and HENDER-SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Samuel S. Eisenberg,* with whom was *Jacob Yosef Miliman* on the brief, for the appellant.

*Michael F. Freedman* and *Stanley J. Schapiro* for the appellee.

PRESCOTT, J., delivered the opinion of the Court.

This suit involves the custody of a four-year-old female child. The appeal is from that part of the decree awarding her custody to the mother, with the right of visitation reserved to the father, after the court had awarded the father a divorce on the ground of adultery.

The appellee-mother, now twenty-seven years' old, married a soldier, one Milton Uhden in 1949. He left this country in May or June of 1950 and was stationed in Korea as a member of the Armed Forces of this country. A daughter, Phyllis, was born in Pittsburgh on March 3, 1951, while Uhden was still abroad. There was testimony presented at the hearing attempting to cast doubt upon the paternity of Phyllis, but Uhden never publicly denied her as his child. The appellee was permitted to obtain an uncontested divorce from this husband on the ground of desertion on July 15, 1952.

Richard N. McCabe, the appellant, was also a member of the Armed Forces and met the appellee a few months before

the divorce from Uhden. They were married on August 17, 1952, one month after this, her first, divorce. Shortly thereafter, McCabe was transferred to Oklahoma and later to Delaware. The appellee accompanied him, leaving Phyllis, then about three years old, in the care of her mother and sister in Catonsville. Wanda, the subject of this suit, was born on November 5, 1953. When but three months of age, despite the father's repeated protests, the mother took her and Phyllis to live with their grandmother in Catonsville and left them there until September, 1954, when McCabe was ordered to Fort Meade.

Upon his discharge in January of 1955, he returned to Catonsville and took a position as an automobile salesman. His wife refused to live with him, so he re-enlisted in the service, was later transferred to Greenland and finally discharged in October of 1957. He, too, is now twenty-seven years' of age.

There was much testimony to the effect that the mother neglected the children; that she failed to prepare and give them their meals; that she frequently left them unattended while she went out on dates with other men; that she had often gone out with a married man, Sergeant Mitner, while her husband was away; and that while out on one of these dates she was hospitalized as a result of an automobile accident at two o'clock in the morning. Testimony was also presented to show that she drank frequently; was indifferent to the children's clothes and their appearance; and that she failed to develop an attitude of love, affection and kindness towards them.

While her husband was stationed in Greenland, she began going out with one Pete Athas. Soon an illicit relationship developed between them, and in June of 1957, she, Athas, Phyllis and Wanda moved into an apartment rented by him at 3909 Penhurst Avenue in Baltimore City. Another daughter, which she admits is Athas', was born to her on August 19, 1957. On December 18, 1957, the appellant was granted a divorce from the appellee on the ground of adultery. Four days later she married Athas and is now living with him and her three children.

We shall quote a short passage in one of the letters that the appellee wrote to her husband when he was stationed in Greenland and she was living with her mother, as it throws some light on her emotional qualities. It is: "But if I don't soon get out of this house I am going to pack a suit case one day and say to hell with it all. This time if I leave an accident won't stop me it will probably kill me. But I guess everybody would be better off that way. Mom could have Phyllis and you could have Wanda * * * ." The mother denied few of her indiscretions; indeed they had been so open and brazen that it would have availed her little had she done so.

An investigation of the case was made by the Probation Officer of the Supreme Bench of Baltimore City and by the Probation Department in Rye, New York, where the father resides. The first of the above reports is full and comprehensive, but only a few of its contents will be repeated here. The appellee's former mother-in-law wrote the Department that she had known the appellee for nine years and feels that she would be a proper person to rear her children. One character reference given by the appellee failed to respond to the inquiry addressed to her. Mrs. Nichols, who boarded in the home of the appellee's mother for seven or eight years, described the appellee as a "ruthless" person, "who has always done exactly as she pleased, never caring as to who was hurt in the process." She stated that the appellee's first husband was her sister's beau and she deliberately set out to take him from her. Mrs. Nichols felt that the appellee has no right to have the child; that she has no patience with the child or her own mother, who has unselfishly cared for the appellee and appellee's children through the years; that when her mother would ask her to get up and fix breakfast for the children, she would curse her mother in a very loud tone; and she would scream at the children "as if they were animals." There was testimony to show marked hostility on the part of Mrs. Nichols towards the appellee.

The appellee's mother told the Department that she was ashamed and heart-broken concerning her daughter's conduct, but she did not believe the appellant sincerely wanted

the child, that he never wanted a baby and said he would rather have a dog or a horse.

Mr. Love of New York City, a vice-president of the Metropolitan Life Insurance Company, and a Mr. Berges of White Plains, N. Y., an attorney wrote letters of high recommendation to the Department concerning the appellant and his father and mother and the environment of their joint dwelling place.

The report concludes by stating that from the information gathered it would appear the appellee is an "irresponsible, self-willed young woman who will try to get what she wants at all costs"; that she has been immoral; that in the past she has left her children with her mother and had dates with men, as though she were not bound by marital ties; and that she professes love for the child and thinks she can offer her everything the father can, plus a mother's love. The report then recommends that the custody be granted to the father for the major portion of each year with about two months as an allotted time to spend with the mother.

The report from Rye, New York, describes in some detail the dwelling place of the father. He is employed as assistant manager of the Coveleigh Club, where his father and stepmother are the resident managers, positions they have held for nearly twenty-five years. He receives $250, per month, plus accommodations. The club is located on a thirteen acre estate. The building is a three-story brick structure with large verandas and two one-story wings. The father of the child and his parents occupy a well-furnished large apartment therein. The club is located near a school and the schoolbus passes by its door. The report stresses the wholesome character of the environment there and points out the opportunity that Wanda would have "to associate with a large number of very nice children." It further states: "I definitely would recommend this placement even if Wanda did not live in Baltimore under the circumstances described to me by Mr. McCabe."

The complaints made against the appellant were that he had been inattentive to the child and his wife; that he had,

on at least one occasion, struck the mother; that he did not furnish comfortable and adequate living quarters when he was in the army; and that he stated before the child was born he would rather have a dog or a horse than a child.

We have repeatedly stated that in custody cases the best interests of the child are controlling. In determining where those interests lie, courts take into consideration the natural feelings of affection for their children which parents normally have, and also give consideration (subject, of course, to the paramount interests of the child) to the legitimate desires and interests of the parents in relation to the custody of their children. *Pangle v. Pangle,* 134 Md. 166, 170, 106 A. 337. Unless the mother is an unfit person, she is usually preferred during the tender years of a child, *Townsend v. Townsend,* 205 Md. 591, 109 A. 2d 765, *Roussey v. Roussey,* 210 Md. 261, 264, 123 A. 2d 354; and, other things being equal, a divided control is to be avoided, *Cullotta v. Cullotta,* 193 Md. 374, 66 A. 2d 619; *Roussey v. Roussey, supra.* This Court has on many occasions sustained the award of custody of a child to its father, who has obtained a divorce on the ground of the adultery of the mother. Among these cases, see *Hill v. Hill,* 49 Md. 450; *Kremelberg v. Kremelberg,* 52 Md. 553; *Pangle v. Pangle, supra; Poehlman v. Poehlman,* 130 Md. 695, 102 A. 1052; *Swoyer v. Swoyer,* 157 Md. 18, 145 A. 190; *Townsend v. Townsend,* 205 Md. 591, 109 A. 2d 765; *Pekar v. Pekar,* 188 Md. 360, 52 A. 2d 468; *Stimis v. Stimis,* 186 Md. 489, 47 A. 2d 497. In *Oliver v. Oliver,* 217 Md. 222, 140 A. 2d 908, a divided Court held that a wife who has committed adultery was not necessarily unfit to have the custody of her child. And in *Miller v. Miller,* 191 Md. 396, 408, 62 A. 2d 293, this Court said: "We must look to the future welfare of this infant. In making our decision we should not gamble about that future. We can only judge the future by the past."

It seems unnecessary to elaborate further upon the facts of this unfortunate and unpleasant picture. Applying the above principles of law to the facts at hand, we think it clear that the best interests of the child would be subserved by awarding her custody to her father.

Counsel for the appellee urges that she is now through with her immoral conduct and affairs with men; that she has married her paramour and, therefore, no longer is committing adultery; and that she is the proper person to raise the child. The same situation developed in the *Pangle* case, *supra,* and this Court rejected such argument. And as stated in the *Miller* case, *supra,* Courts should be most reluctant to "gamble" with an infant's future; there is no way to judge the future conduct of an adult excepting by his or her conduct in the past.

The home of the father, as described in the testimony, affords a better opportunity for a proper environment for rearing the child. We, therefore, conclude the chancellor was in error in awarding the custody of the child to its mother. We hold that her custody should have been awarded to the father with reasonable rights of visitation by the mother, subject to the further order of the court.

*Decree reversed in part, and the cause remanded for the entry of a decree not inconsistent with this opinion; the appellant to pay the costs.*