## PARKER *v.* PARKER

[No. 176, September Term, 1959.]

*Decided March 16, 1960.*

The cause was argued before Brune, C. J., and Henderson, Hammond, Prescott and Horney, JJ.

*Theodore G. Bloom,* with whom was *Albert J. Goodman,* on the brief, for appellant.

No brief and no appearance for appellee.

Brune, C. J., delivered the opinion of the Court.

This case concerns the custody of the eight-year-old son of divorced parents. The wife obtained a divorce on the ground of three years' voluntary separation, and custody of the child was awarded to her, with rights of visitation to the father. The father appeals; there is no brief or appearance on behalf of the mother.

The evidence shows that the mother, Mrs. Parker, had lived in open adultery with the paramour, a Mr. Carmean, for a period of about a year and a half, but it is not shown that any intimate relations existed prior to the separation of the parties to this suit.[1] The paramour was a married man, sepa-

---

1. Since the ground of divorce was voluntary separation, recrimination was not available as a defense. *Matysek v. Matysek,* 212 Md. 44, 128 A. 2d 627; *Hughes v. Hughes,* 213 Md. 452, 132 A. 2d 119, and (same case) 216 Md. 374, 140 A. 2d 649.

rated from his wife. In September, 1957, the appellee mother took the child here involved, Levin R. Parker, III (the only living child of the parties), to Florida with her. There she and Carmean lived together for three months in a tourist motel as husband and wife. Included in the group at the motel was Carmean's son, who is about four years older than Levin. In December, 1957, the appellee and Carmean returned to Maryland, and until February, 1959, they continued to live together at various places as husband and wife. At that time the appellee moved into her mother's apartment with the child, but without Carmean, and claims to have ceased cohabitation with him from that time up to the time of the trial. She testified she was in love with him and that she intended to marry him when she obtained a divorce. The paramour and his wife had been divorced about two years prior to the trial of this case.

It appears that the mother took generally good care of the child physically. She and Carmean joined a church in Anne Arundel County after returning to Maryland and about a year before the trial. The pastor of the church testified that he considered the mother a fit person to have the care and custody of the child and that he did so without any reservations. The mother claimed to be sorry for her misconduct, admitted that she had been wrong and declared her desire to have the child and to bring him up properly. She also said that she expected to go back to work. She offered no testimony as to plans for the care of the child while she might be away at work and he would be out of school.

The child has moved about as the mother has moved about, and her moves seem to have contributed to his rather frequent changes of school. His school attendance has been somewhat irregular and his school progress unsatisfactory. That appears to have been due in large measure to his emotional instability, and he is described as nervous and upset. Both the principal of his school and his teacher have been concerned about the boy. His teacher wrote this as a summary following a conference with the boy's mother: "I have my doubts about too much effort by Mrs. Parker to help Levin. Her personal life is too complicated, and she is really more interested in her

life than the well being of her child. She and Mr. Parker are separated. Child spends some time with both parents. I believe this is the biggest factor in child's problem."

There was also evidence that the child had said that while he was in the custody of the mother he frequently went to bed late at night, including school nights. His uncle, a brother of his father, testified to an incident of this sort at the movies in February, 1959. On this occasion, the mother and Carmean had taken both Carmean's son and young Levin to the movies on a school night. Levin went over to his uncle, got in his lap and went to sleep. The uncle left the movie at about 11:15; the boy was still there.

The father, aged 31, has been an employee of the Post Office Department for over ten years. The Chancellor commented that the testimony "tends to prove that the husband's conduct and reputation have been good which cannot be said about the wife." The father, too, is a church member and he has taken the boy to Sunday school each Sunday when the boy has been with him. The father lives with his parents, who would be quite willing to have the boy live with them, too. The testimony indicates, and the Chancellor found, that the boy would perhaps have a higher standard of living if custody were awarded to the father.

The boy himself was questioned as to his feelings towards his parents and his preference. In substance he testified that he loved each of his parents and that he would prefer to live with his mother. He also said that he loved his father's parents and that he liked Mr. Carmean.

There was testimony, not contradicted, by the father's brother that the boy had told him he did not get along well with Carmean's son—that he did not like him and that they fought. There was also testimony, likewise not contradicted, by the father, his brother and his mother to the effect that the boy was always very much upset when a visit to his father would come to an end and the time would come for him to be returned to his mother.

The Chancellor stated that he had observed the demeanor and carefully considered the testimony of all the witnesses, that he did not believe the then Mrs. Parker to be grossly

immoral, but that she was sincerely repentant and would be a loving and devoted mother, and that the child (not then eight years old) needed "this devoted care." He added that if it should prove that the court was mistaken as to the mother's future conduct, the decree as to the child might be annulled, varied or modified at any time. After stating that materially the child might be better off with the father and observing that "experience has proven that many of our outstanding men lived a lean boyhood," he concluded his opinion with this sentence: "In my opinion, the stability and welfare of this child requires me not to change the guardianship and custody from the mother."

The problems presented by this case have been so fully considered in the case of *Hild v. Hild*, 221 Md. 349, 157 A. 2d 442, which was decided by this Court a few months after the Chancellor's decision in the present case, that any extended discussion of the applicable law would be merely repetitious. As we there reiterated, the welfare of the child is the primary consideration by which a court must be guided in a custody case. That case and this are strikingly similar in many of their facts—among them the approximate age of the boy, his expressed preference for living with his mother, the fact that, with the child as a member of the household, the mother had lived in open adultery, the good reputation of the father, the availability of his parents and of their home for the bringing up, or help in the bringing up, of the child.[2] There are also some differences. The mother here was frank and open in admitting the error of her ways, which was not so in the *Hild* case. On the other hand, the mother's influence on the child's schooling here seems to have been clearly to the disadvantage

---

2. One other point of resemblance, which was not a fact upon which the majority rested its decision in the *Hild* case, is the marriage of the mother and her former paramour. In the instant case, that had not occurred at the time of the signing of the decree. We were informed at the argument (in response to a question from the bench) that such a marriage had taken place in the instant case after that portion of the decree which awarded a divorce had become final. Even if this fact were properly before us, it would be of no controlling effect here.

of the child and to have been prompted by her readiness to put her own interests and desires ahead of the child's welfare. Likewise, there is no question here, as there was in *Hild,* of separating the child from a sibling. Quite to the contrary, what evidence there is on the subject suggests that this boy would be better off living elsewhere than with his step-father's son. It should perhaps be added that here the husband did not obtain a divorce on the ground of adultery, as in *Hild;* but here the adultery was freely admitted by the wife's testimony and was corroborated by that of a private investigator employed by the husband. The Chancellor evidently accepted it as proven. We do not regard this difference between the *Hild* case and the present case as significant. Cf. *Oliver v. Oliver,* 217 Md. 222, 140 A. 2d 908.

As is stated in the *Hild* case, there is no absolute and inflexible rule as to the award of custody of a child of divorced parents. Ordinarily, custody of a young and immature child is awarded to the mother, even though the father is without fault, if she is a fit and proper person to have custody of the child. This rule will give way if it is demonstrated that the mother is not such a person. Usually, the fact that the mother has been guilty of adultery will be taken as indicating that she is not a proper person to have custody, and a strong showing must be made to overcome the usual rule or presumption against awarding custody to an adulterous mother. All of these rules are, we think, recognized in the *Hild* case. So, too, are the rules which ordinarily favor keeping children together and which give consideration to the child's preference when he is of sufficient maturity and discretion to express a rational preference. The first of these rules has no application on the facts of this case; and because of the youth and immaturity of the child here, this case, like the *Hild* case, falls under the exception to the second of these rules. To avoid repetition, in stating the above rules, we have not cited here many authorities which are cited in the majority opinion in the *Hild* case, and we simply refer to that opinion for them.

We are well aware of the difficulties which beset appellate review in custody cases, and we bear in mind what amounts to a presumption in favor of the correctness of the findings of

the Chancellor on questions of fact and the importance of his opportunity to see and hear the witnesses, both of which are recognized by Rule 886 of the Maryland Rules. There is little, if any dispute as to past events which seems relevant to the question of custody. The Chancellor was evidently much impressed by the mother's confession of error and avowal of repentance. In *Miller v. Miller*, 191 Md. 396, 62 A. 2d 293, and *McCabe v. McCabe*, 218 Md. 378, 146 A. 2d 768, this Court has expressed a reluctance to gamble with an infant's future and has emphasized the past conduct of an adult as a guide in judging his or her future conduct. The weight to be given such declarations as those just referred to, which were made by the mother in the course of the trial is, we think, open to a good deal of question. Even when there is added the favorable opinion of the pastor of the church which she had recently joined, we think that the mother has failed to make the strong showing called for under the rule of the *Hild* case. We regard that case as controlling here. Accordingly, the decree will be reversed and the case will be remanded for the entry of a decree awarding the custody of the child to the father, with reasonable rights of visitation to the mother.

> *Decree reversed and case remanded for the entry of a decree in accordance with the opinion herein; the costs to be paid by the appellant.*