CORNWELL *v.* CORNWELL

[No. 205, September Term, 1966.]

*Decided December 13, 1966.*

*Motion for rehearing filed January 9, 1967, denied January 17, 1967.*

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, BARNES and McWILLIAMS, JJ.

*Howard Shecter* and *Franklin Somes Tyng* for appellant.

*Nelson R. Kerr,* with whom were *Nelson R. Kerr, Jr.,* and *Edward D. Higinbothom* on the brief, for appellee.

MARBURY, J., delivered the majority opinion of the Court. BARNES, J., dissents. Dissenting opinion at page 680, *infra.*

This is an appeal from a decree of the Circuit Court for Harford County (Stewart Day, C.J.), dated February 25, 1966, which ordered a change in custody of the two daughters of the parties from one of the divorced parents, the father, to the other, the mother. From this decree the father has appealed.

The marriage, which produced the two daughters, had an unsettled history. The appellee, Anna May Gordon Cornwell, who was sixteen or seventeen years old at the time, married Seldon A. Cornwell, appellant, on April 25, 1952, in Maryland. Following the marriage, the parties moved to Florida where the husband was stationed in the Marine Corps. On December 8, 1953, the first of the two children was born in Florida. After the husband was discharged from the Marines in February 1954, the family returned to Maryland, where appellant had a succession of jobs and where they lived in a number of different places from that time until they purchased a house in Street, Maryland, in December 1958. In June 1955, because of continuous domestic strife, the wife left her husband and went to Florida, allegedly with another man, leaving her infant daughter with an acquaintance while appellant was at work. She failed to notify him of where she had left the child and, as a consequence, he did not learn of the location of his daughter until two weeks later. There was a reconciliation six months subsequently, and the parties lived together for nearly seven years. On September 1, 1956, the second daughter was born.

There was testimony by an acquaintance of the wife, that she and the wife on two occasions met men in various bars in the winter of 1961 or 1962. In early 1962 the parties again separated, the wife leaving the husband and the two children. The cause of this separation is not clear. Appellant claimed it was because of a letter which spoke of a date which another man had with the appellee. Later, in June of 1962, appellee obtained a court order awarding her custody of the children. After three or four months, appellee lost her job, and the parties attempted to effect a reconciliation which lasted only a couple of weeks. They separated again, and the children remained with the appellant, because appellee was unemployed and had no sufficient accommodations in which to keep her children.

On November 5, 1962 or 1963, appellee was seen leaving a motel room with another man early that morning by appellant's sister who had been called to the scene by appellant. Appellant had noticed his wife's car parked in front of the motel. Again, a friend and fellow employee of appellant and appellant saw his wife nude in a motel room with another man with whom she had allegedly been living for some time prior to this incident. Apparently, this was the final straw, as the parties were divorced on September 8, 1964, the divorce being based on the ground of the wife's abandonment. The decree awarded custody of the children to the father subject to further order of the court. At that time the wife lived in a boarding house and worked as a waitress, which job did not pay her enough to maintain herself and the two children. The history of the relationship between the parties after the divorce shows a continuous conflict over visitation rights and privileges.

On April 17, 1965, appellee married a man whom she had met in August 1964, and with whom she had been seen spending the night of March 25, 1965, in his trailer. On August 24, 1965, appellee filed a petition for the custody of the two daughters on the basis that she now had a new, three bedroom house, had settled down, and could provide a wholesome environment for her children.

The hearing on the petition lasted three days, November 19, 22-23, 1965, and the chancellor heard numerous witnesses; with the consent of counsel for both parties, spoke in private with the two daughters who stated that they loved both parents equally; and later received an oral report from the probation department. The chancellor found that appellant, who worked during the day and was off only on Mondays and Tuesdays, left his children to be cared for by his elderly parents with whom he and the children were living in a farm house. The appellant's mother was sixty-eight years old and had a chronic back condition. His father was sixty-seven years old and was hard of hearing. Appellant's divorced sister, who had children of her own and who sometimes cared for appellant's daughters while she lived at the farm house, had moved out of the house and was living nearby. Appellant told the chancellor that he intended to marry again and move into a trailer. The children

told the chancellor that they disliked the prospective stepmother, and the father informed the court that he would not marry her if the children did not really like her. At the oral argument on appeal it was admitted that subsequent to the hearing he had married her. The chancellor was unable to determine if the farm house in which the appellant and the children were living was adequate for the needs of the number of people living within it. He found the sleeping arrangements makeshift at best.

Appellee showed that she and her second husband had recently purchased a new, nicely furnished house with three bedrooms, that she was not employed in a job outside of the home, and that she would have time to give sufficient attention to her children. The chancellor found that appellee's new husband was steadily employed and had a good income, and that his attitude toward the girls was excellent. The two daughters liked him. The chancellor also found that the mother greatly desired to have her daughters with her, and that she had mended her former ways and was fit to bring up her daughters properly. Chief Judge Day, on the strength of the probation officer's oral report, which recommended that the mother have custody, and by his own determination, concluded that since the two daughters were approaching adolescence, the mother's understanding and maturity were greatly needed.

The record before this Court does not contain the probation department's report received by the chancellor. The report, or at least a sufficient summary of it, should have been in writing and have been available to counsel for both parties prior to the chancellor's decision. However, neither counsel insisted upon its being reduced to writing in order to test its accuracy in the court below. As a consequence there is nothing before us for review in that regard. Maryland Rule 885. There is a partial summary of the findings of the probation department in the opinion of the court below, and a review of the record before us indicates that the chancellor was not clearly erroneous in awarding custody of the children to the mother. Rule 886 a.

It is universally recognized that the mother is the natural custodian of her young. Accordingly, the mother is ordinarily awarded the custody of children of tender age, especially girls,

unless it is clearly shown that she it not a fit and proper person. *Sellman v. Sellman,* 236 Md. 1, 202 A. 2d 372; *Oliver v. Oliver,* 217 Md. 222, 140 A. 2d 908; *Porter v. Porter,* 168 Md. 296, 177 Atl. 464. We are not unmindful of the great number of cases which have laid down the general rule that where a separation and a subsequent divorce is the result of adultery on the part of one spouse, the custody of the children, born during the marriage, is awarded to the innocent party, not as a matter of punishment, but because it is assumed that the child will be reared in a cleaner, more wholesome, moral atmosphere. *Palmer v. Palmer,* 238 Md. 327, 207 A. 2d 481; *Ferster v. Ferster,* 237 Md. 548, 207 A. 2d 96; *Hild v. Hild,* 221 Md. 349, 157 A. 2d 442, and cases cited therein. These cases also require a strong showing to be made to overcome the usual rule against awarding custody to an adulterous mother. The mere fact that the adulterous spouse has married the paramour or that she now has the ability to provide greater comforts for the children is not sufficient to overcome this rule. *Bray v. Bray,* 225 Md. 476, 171 A. 2d 500.

However, the fact that the mother may have committed adultery is not an absolute and inflexible bar to her being awarded custody, for when the adulterous relationship has ceased for a reasonable period of time so as to render it unlikely that it will be revived, and the mother has changed her way of living and has demonstrated that she is a fit and proper person to raise her children in a clean and moral atmosphere, then her past indiscretion may be overlooked in considering the award of custody. *Palmer v. Palmer, supra; Wood v. Wood,* 227 Md. 112, 175 A. 2d 573; *Oliver v. Oliver, supra.*

The primary consideration in cases of this nature is the best interest and welfare of the children. The cases denying an adulterous mother the custody of her children are numerous, but the facts and circumstances in each case are unique. As stated by Judge Hammond (now Chief Judge) in *Trudeau v. Trudeau,* 204 Md. 214, 218, 103 A. 2d 563:

> "Thus, whatever paths of the maze are followed, the destination is always the child's welfare and prospects. Even as no will has a twin, no custody matter is the image of another and in none can the proper paths

be plotted automatically on a map of the principles laid down by the cases. This is why the opinions of this Court reiterate, as particularly applicable, the rule that the opportunity of the Chancellor to see and hear the witnesses must be accorded the greatest respect. It was set forth in *Cullotta v. Cullotta, supra* [193 Md. 374, 384, 66 A. 2d 919], in these words: 'This case is another of those in which the atmosphere of the trial, the appearance and demeanor of the witnesses is invaluable in reaching a correct and just conclusion. If the record in this case left us in doubt, we should not disturb his findings.' "

See also *Raible v. Raible,* 242 Md. 586, 593, 219 A. 2d 777.

The appellee was married to her present husband in April 1965, and the petition for change of custody was filed four months later. The hearing was held in November 1965, and the chancellor's opinion was filed in January 1966. Thus, the chancellor had the opportunity to consider the conduct of appellee over a period of at least nine months before he filed his opinion. He found nothing in that time to lead him to believe that appellee had not led an exemplary life and would not continue to do so. Moreover, since the jurisdiction of the court is continuous in this custody case, should subsequent events justify it in the best interests of the children, the lower court may again modify the award of their custody. *Heaver v. Bradley,* 244 Md. 233, 223 A. 2d 568 (1966) ; *Berlin v. Berlin,* 239 Md. 52, 210 A. 2d 380 ; *Oliver v. Oliver, supra.*

*Decree affirmed, costs to be paid by appellant.*

BARNES, J., filed the following dissenting opinion :

I dissent because, in my opinion, the uncontradicted evidence in the record in this case and the applicable law indicate that the change of the custody of the two female children from their father to their mother was not in the best interests of the children and that the Chancellor's decree of February 25, 1966, providing for the change of custody should be reversed.

Anna May, the mother of Karen, born December 8, 1953, and of Regina, born September 1, 1956, has over a period of approximately ten years, from at least June, 1955, to April, 1965, engaged in an adulterous course of conduct with a number of men, including at the end of the ten year period the man to whom she is now married after he had obtained a divorce from his former wife on March 4, 1965. The evidence of this wrongful course of conduct by Anna May is largely uncontradicted. The Chancellor stated in his opinion that "there was testimony that can only lead to the conclusion that Mrs. Scott [Anna May] was guilty of adultery before the divorce [from Seldon Cornwell, her first husband and father of the two children] became final in September 1964. These transgressions cannot be attributed to youth since she was in her late twenties at the time."

The first episode in her wrongful course of conduct, not only established adultery, but a complete and most unnatural irresponsibility in regard to the welfare of Karen, then an eighteen month old infant. When Anna May departed for Florida "with another man," as the Chancellor found, she left Karen with a Mr. and Mrs. William Harris without notice to Seldon or any of the Cornwell family, so that for a two-week period they were unable to locate the whereabouts of the infant. Finally the father did locate his child and brought her to his parents' house for care and affection during Anna May's absence. Notwithstanding her wrongful actions, Seldon at Anna May's request, came to Florida, brought her back to Harford County and sought to "begin again." After this reconciliation, Regina was born on September 1, 1956. Thereafter in December, 1958, Seldon purchased a property at Street, Maryland, and took title in the names of himself and Anna May as tenants by the entireties.

After moving into this property, Anna May began staying out all night on various occasions, and once remained away for an entire week-end. While still living with her husband, she and a female acquaintance went to a bar for drinks and to meet some men. The acquaintance testified that Anna May finally went out with a man she picked up at the bar. Anna May admitted later that she had had sexual relations with him. A similar episode occurred at a later time. On January 25, 1962, she

left her husband without making any arrangements for the care of her two children then aged eight and six respectively. Seldon again took them to the home of his parents.

On November 5, 1962, Seldon recognized Anna May's automobile parked at a motel on the outskirts of Baltimore City. Seldon asked his sister to drive over and they observed that Anna May remained in the motel room from 11:45 p.m. until 3:15 a.m. She then left with a man identified by name in the record.

In early June, 1963, Anna May, who had been drinking, had an altercation with Seldon's sister at his parents' home, kicked Seldon's brother in the stomach, threatened the sister with her fists, used "very bad language," attempted to take Regina with her in her automobile, and finally left after the State Police had been summoned to remove her from the farm. The two children were at the grandparents' farm and were crying and screaming during this unsavory episode.

On June 28, 1963, Seldon, with a Mr. Kammeer, who knew both of the parties, and a Mr. Desotus, went to another motel in the late evening as Seldon had heard that Anna May was living there with a man. Discovering that Anna May was in one of the rooms, Seldon kicked open the door and discovered Anna May and a man she referred to as "Bucky" (his correct name is given in the testimony) in bed together, both naked. Bucky jumped up, seized a chair and struck Seldon, after which a "violent scuffle" occurred, ending up on the driveway of the motel. Seldon testified that Anna May was also "in the scuffle." Bucky seriously injured Seldon by striking or kicking him in the stomach as a result of which he spat blood and was taken to the Havre de Grace hospital for treatment.

Mrs. Priscilla Cornwell testified without contradiction that when Seldon told Anna May that Bucky was a married man and that she should not be living with him, Anna May replied "she didn't give a damn if he was married or not, she loved him and he loved her, and that she was going to go on living with him."

Anna May began to date her present husband, Mr. Scott, in August or September, 1964, over six months before Mr. Scott obtained his divorce a vinculo matrimonii from his then

wife on March 4, 1965. Anna May had a key to a pink and white trailer owned and then used as a residence by Mr. Scott. On at least one occasion, the two children visited their mother at this trailer prior to her marriage to Mr. Scott, as this was where she resided.

There was also uncontradicted evidence that when Anna May at one time prior to Seldon's obtaining his divorce decree, had custody of the two girls (and had taken them to Baltimore City contrary to the custody order), she placed them with her sister, who was herself living in a "common law relationship" with a man and whose children by her lawful husband had apparently been taken from her by a court order. After a short time in Baltimore, Anna May asked the parents and sister of Seldon if they would take back the children as "they got on her nerves." There was also evidence that Anna May was not a good housekeeper and at times when Anna May and Seldon were living together, he had to get his own dinner after returning from work.

When the Street property was sold under a decree of the Circuit Court for Harford County for a sale in lieu of partition, Anna May was dissatisfied with one-half of the net proceeds, approximately $400, and threatened Seldon that if she did not receive $2500 from the proceeds of sale, she would file a petition for change of custody and take the girls away from him. The petition for the change of custody was filed on August 24, 1965, approximately four months after Anna May married Mr. Scott.

Contrasted with this woeful saga of Anna May's adultery, excessive use of alcohol, violence, profanity, and general failure as a wife and mother, the uncontradicted evidence shows that Seldon during this trying ten-year period was a devoted father, an upright and respectable citizen who properly and lovingly cared for his two children. The Chancellor found that Seldon "has, so far, done an adequate job of providing for them [the two children] and has given them his love and affection." The Chancellor's interview with the two children, with the consent of counsel, indicated that they would be satisfied to live with either parent.

We have heretofore declined to award the custody of chil-

dren to an adulterous mother where her degree of guilt was far less than that of Anna May in the present case. In *Bray v. Bray*, 225 Md. 476, 171 A. 2d 500 (1961), the custody of a female child, four years of age, was awarded to the father after the adulterous mother had married her paramour, lived with him in a substantial and adequate home and contrary to the recommendation of the probation department that custody be given the mother. The only adultery of the mother shown was with the paramour she married after the divorce from the father of the infant daughter. The father lived at the home of friends who would care for the infant daughter while the father worked. In affirming the Chancellor's decree awarding custody of the infant to the father, Judge Prescott, for the Court, reviewed our prior decisions, and stated the applicable law as follows:

> "* * * it seems clear from these decisions and the authorities cited therein, as well as any number of previous decisions of this Court, that the primary consideration of the Court in a custody case is the welfare of the child, and each case must be determined by its own particular facts. There are many factors that may properly be considered in determining what are the best interests and welfare of a child, when its custody is involved. Among these is the fact, if shown, that its mother has committed adultery. The fact that she has committed adultery does not constitute an absolute and inflexible bar to her being awarded custody (221 Md. 358; 222 Md. 75), for when the adulterous relationship has ceased for a reasonable period of time so as to render it unlikely that it will be revived, and the mother has changed her way of living and demonstrates that she is a fit and proper person to raise her child in a clean and wholesome moral atmosphere, then her past indiscretions may be overlooked in considering the award of custody. But, when it is shown that the mother has committed adultery, the courts in this state (see the long line of Maryland cases cited in footnote 4 of the *Hild* case) and elsewhere usually award the custody of the children

to the innocent party (provided he be a fit and proper person), not as a punishment or reward, but upon the assumption, which bears directly on the children's welfare, that they will be reared in cleaner and more wholesome moral surroundings. And the mother, who has been shown to have committed adultery and who claims to have mended her ways and to be a fit and proper person to raise a child, must make 'a strong showing' to overcome the usual rule against awarding custody to an adulterous mother; and, although the fact that she has subsequently married her paramour may be considered in determining her fitness, it, alone, will not be regarded as meeting the requirements of such a showing." (225 Md. at 483-84, 171 A. 2d at 504).

In *Hild v. Hild,* 221 Md. 349, 157 A. 2d 442 (1960), we reversed the decree of the Chancellor awarding the custody of a seven year old boy to an adulterous mother who had married her paramour and who was guilty of adultery with only two men (one was the paramour). The probation department in *Hild* had recommended that custody be continued in the mother as in the probation officer's opinion the mother, notwithstanding her prior adultery, would put the welfare of the children first and her past conduct would not reflect upon them in the future. Furthermore, the probation officer was satisfied that the home of the mother and her new husband would be "an excellent environment" in which the boy would be "excellently cared for."

In *Parker v. Parker,* 222 Md. 69, 158 A. 2d 607 (1960), we again reversed the Chancellor who had awarded the custody of an eight year old son to the adulterous mother. In *Parker,* the mother and father were divorced on the ground of desertion and after the divorce, the mother lived in adultery with a married man whom she married subsequent to his obtaining a divorce from his first wife. There was no showing of any other adultery by the mother. After the mother's marriage to her paramour, she joined a church and her pastor testified that he considered her a fit person to have the care and custody of the child. The mother freely admitted her wrong-

doing and claimed that she was sorry for her misconduct. The father lived with his parents who indicated that they would be willing to have the boy live with them. The boy testified that he loved both parents but that he preferred to live with his mother. The Chancellor in *Parker* stated, in his opinion, that he had observed the demeanor and had carefully considered the testimony of all the witnesses; that he did not believe the mother to be "grossly immoral"; that she was sincerely repentant, would make a loving and devoted mother, and that the child needed "this devoted care." He concluded that "the stability and welfare of the child requires me not to change the guardianship and custody from the mother."

In *Hild* and *Parker* we did not find the Chancellor's findings and decrees granting custody to the adulterous mother, on far more appealing facts in favor of the mother than the facts in the case at bar, to be of such weight that we would not reverse them when those findings and decrees were clearly erroneous and were not for the best interests and welfare of the children involved. In my opinion, the Chancellor's findings and decree in the present case are clearly erroneous, are not in the best interests and welfare of the children involved, and the decree should be reversed.

In the case at bar, the Chancellor found that Anna May "is truly repentant of her past misdeeds." I have carefully reviewed the record and cannot find any evidence to support this conclusion. She did not *say* she was repentant of her past misdeeds. She expressed no sorrow or remorse for her numerous acts of adultery, violence, desertion of her children and other misconduct and the suffering this caused to her former husband and to her children. She blatantly defied every established convention for the marital status and when reminded that her then lover was a married man with whom she should not be living, she defiantly stated that she "didn't give a damn if he was married," and that she intended to continue to live with him. Even at the end of the ten year period, she spent part of her time, at least, at the pink and white trailer of her present husband before he received his divorce decree and had the children visit her there. There is no repentance indicated in this record, but on the contrary, a consistent adherence to her evil way of life

and a fixed determination to continue it regardless of the rights or feelings of others. As pointed out in *Parker,* even if there was clear evidence of repentance, this would not be sufficient to justify the Chancellor in awarding custody to the adulterous mother.

I am not impressed with the Chancellor's statement that Anna May, since her marriage to Mr. Scott, "has shown no inclination to stray toward any conduct which would preclude her from fulfilling the duties of a mother." In the first place, Anna May and Mr. Scott had only been married for approximately seven months when the testimony was concluded on November 23, 1965, far too short a period of time to make this conclusion based on the absence of evidence of misconduct, in view of the preceding ten year period of gross misconduct. In the second place, it is only wise to predict the future course of conduct by the conduct of the person in the past and surely Anna May's past conduct would not present a reassuring prognosis for her future actions. In *Hild* and *Parker,* the mother had also apparently lived an exemplary life after marrying her paramour, but the Chancellor's decree awarding custody to the mother was reversed in each case.

Nor am I impressed with the Chancellor's observations in regard to the age of the grandparents and the onerous burden on the grandmother if custody were continued in the father. The fact is that the grandparents are entirely willing to continue the burden which they have borne for a considerable period and it is conceded and found by the Chancellor that the two girls have been well cared for both physically, religiously and morally in the grandparents' home.

Another extraordinary thing in this case is the absence of any written report of the probation department. I think there are grave questions of due process of law in having a decision of a court based, even in part, upon evidence which is not in the record and which has not been subject to review by counsel for the parties. I agree that the questions of due process are not before us for the reason stated in the majority opinion. What does appear in the Chancellor's opinion in regard to the probation officer's conclusion, however, indicates to me a re-

sult contrary to that reached by the Chancellor. The Chancellor stated in his opinion:

"The basis for this determination [by the probation officer that custody should be given the mother] was a combination of factors. The probation worker *stressed the fact* that the *Cornwell girls are approaching adolescence,* a time when a *mother's understanding and experience is greatly needed.* While Mr. Cornwell would do his best to bring the girls through this trying period, it is doubtful if his counsel would be entirely satisfactory." (Emphasis supplied).

In my opinion, the very fact that the two girls are approaching adolescence, would be a principal reason why Anna May should not have custody of them and the father's custody should have been continued. It is difficult for me to see what possible benefit the children could receive from Anna May's "experience" or from her advice and guidance. Seldon, when the question of advice to the children was put to him, answered that he felt competent to give them advice and if not would seek the help of his sister, parents and possibly some of the members of his church. The evidence indicates that the source of advice outlined by the father would be far better for the children than any advice given by the mother. In *McCabe v. McCabe,* 218 Md. 378, 383, 146 A. 2d 768, 771 (1958)—a case having somewhat similar facts to those in the case at bar—we reversed a decree of the Chancellor in that case awarding custody of a four year old female child to the adulterous mother who had married her last paramour. Judge Prescott, for the Court, in quoting from *Miller v. Miller,* 191 Md. 396, 62 A. 2d 293, aptly stated:

"We must look to the future welfare of this infant. In making our decision we should not gamble about that future. We can only judge the future by the past."

In addition to all of what has already been stated, it should be kept in mind that the father had already been awarded custody by the Circuit Court for Harford County in its decree of September 8, 1964. Chief Judge Brune, for the Court, sum-

marized the Maryland law in *Winter v. Crowley,* 231 Md. 323, 330, 190 A. 2d 87, 91 (1963), when he stated:

"In *Pangle v. Pangle,* 134 Md. 166, 106 A. 337, and in *Townsend v. Townsend,* 205 Md. 591, 109 A. 2d 765, it was held that in a case such as this it required very strong evidence of the propriety and wisdom of such a course to justify transferring the custody of a child from the father to whom it had been awarded to the mother who had been guilty of adultery.

"To the reasoning of the cases just cited which puts the emphasis mainly on the mother's past dereliction, we may add that, assuming that the mother here has genuinely reformed, we think that a change of custody is not desirable unless there is some strong reason for it. These children have gone through the very disturbing experience of the separation of their parents and of their own separation from one parent. To repeat the latter process by separation from the parent who now has their custody and is fit to have it, without some clearly apparent benefit to the children to be gained thereby would, in our opinion, be definitely contrary to their best interest * * *."

These observations, in my opinion, are most apposite to the case at bar and it is indeed contrary to the best interests of the two girls to have their custody awarded to their mother.

I would reverse the decree of February 25, 1966.