INSOGNA *v.* INSOGNA

[No. 274, September Term, 1961.]

*Decided June 7, 1962.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT, MARBURY and SYBERT, JJ.

*Richard C. Murray* and *Eugene G. Ricks,* with whom was *W. Lee Harrison* on the brief, for the appellant.

*Irvin S. Friedman,* with whom was *Joel H. Pachino* on the brief, for the appellee.

PRESCOTT, J., delivered the opinion of the Court.

The appellant and appellee were married in Baltimore County on November 27, 1952, and lived together until November of 1959, at which time the wife left the marital domicile. Subsequent developments, related below, produced a divorce *a vinculo* for the husband on the ground of adultery by the wife and an award of custody of a five year old son to the husband, with reasonable rights of visitation given to the wife. The wife did not challenge, by appeal, the correctness of the chancellor's ruling concerning the divorce, but claims in this appeal that she should have been awarded custody of the child.

At the time of the marriage of the parties, the appellant was employed at the Glenn L. Martin Company, and she continued

this employment until after the birth of her child on July 10, 1956. She severed her connection with Martin in February, 1957. The marital relationship between the husband and wife seems to have been satisfactory up to this point and for two years thereafter (there were several incidents, mentioned below, during this period of which both the husband and wife complained after she had left the home).

Somewhere around February of 1959, the wife went to work with the Western Electric Company, serving on the third shift from 11:30 p.m. until 8:00 a.m. With her husband's knowledge and consent, she rode to and from work with a certain Francis Jones, a married man, in his automobile. When his wife began to "leave early for work [and] started to buy smarter clothing," the appellee husband became suspicious. He stated that he followed Jones and his wife while they were on their way to work and saw them hug, kiss and "neck" enroute to Western Electric and on the parking lot thereof. The wife, apparently, was quite displeased by this conduct of the husband, for she left their abode in November, 1959, just two months after they had purchased a new, modern home, taking with her the child. She later told the probation officer she had two reasons for leaving: (1) primarily, her husband's jealousy and (2) his "unreasonable demands for sexual gratification."

In February of 1960, the husband filed suit for an absolute divorce alleging the wife had committed adultery with Jones. She answered, denying the adultery; and countered with a cross-bill for a divorce *a mensa,* alleging cruelty of treatment and constructive desertion.

At the divorce trial, the wife named four incidents which she considered of serious moment. One had occurred back in 1952, when she was late one night in coming home. She had done nothing wrong, but her husband stated to his sister-in-law something to the effect that he was going to get his gun and kill "whoever she's with." The sister-in-law told him to "simmer down" and go back to bed, which he did. The second occasion was in October, 1959, when she claimed he had come home with too much to drink, and wanted to have sexual relations. She testified he slapped her at this time. He denied the

slapping. The chancellor made no specific finding as to whether or not the slapping occurred, but noted that it was not of sufficient importance for the wife to notify her mother, who was in the house at the time.

The third incident also occurred in October. She claimed that when she refused to have sexual relations with him due to the fact that she was menstruating, he tried to choke her. He denied making any attempt to choke her. The chancellor noted that the husband cooled down "very shortly" and there was no necessity for any medical treatment to the wife, as is frequently the case in matters of this kind when they are of a serious nature. The last incident was when she refused to have sexual relations with the appellee because she had returned home from a D & C operation only a few days before. He got mad and ripped the top of her pajamas.

The chancellor found that the husband was a "hot-tempered," "extremely jealous" man, whose suspicious nature was one of the principal reasons the parties had "not been getting along as well as could [have been] expected"; and that his conduct in requesting sexual relations at improper times was "reprehensible." But, after "adding [the evidence] all up," he could not find that the husband's conduct amounted to cruelty of treatment, or justified a holding that he had been guilty of constructive desertion. The wife's cross-bill was, therefore, dismissed.

This brings us to the husband's charge of adultery by the wife. We shall only summarize the evidence. Jones was a married man. We have already noted that the husband stated that he followed Jones and his wife on their way to work before she left the marital abode on November 21, 1959, and saw them hug and kiss. She admitted that she went to midnight Mass on Christmas Eve with Jones; that she had a private nickname for him, Tops, derived from a "place" where he and she had stopped; that she told her husband, in the presence of her mother, that she loved Jones; that she had sent Jones a Christmas card on which she used the Polish expression for "I love you," and also sent one on behalf of the three year old son; and that Jones had put his arm around her.

On January 3, 1960, the appellant was living in a house with her mother and her child. The mother spent the night out. Jones came to call around 9:00 p.m. The appellee and a witness were watching the actions of the people inside the house from the outside. The appellee and this witness testified that Jones and the appellant sat in the living room drinking beer in the presence of the child until around 11:00 p.m., when the child went to bed. Thereafter, the light in the house was very dim, and the witnesses saw Jones lying on top of the appellant on the sofa. At about 1:30 to 2:00 a.m., they made a noise in front of the house. The witnesses saw Jones and appellant get off the sofa; he had his trousers down and the appellant was but partly clad. She called the police who arrived shortly. Jones admitted that he kissed her, but both he and appellant denied committing adultery. The chancellor found, despite the denial thereof by the appellant, that she was in love with Jones. He stated that Jones was "not an impressive witness," he "was very evasive," and that "he placed little credibility on the testimony of Mr. Jones." He stated further that he was "inclined to believe the witness for the [appellee] rather than Mr. Jones," and "they [the appellee and his witness] convince me that there is truth in what they say." He then found that the appellant had committed adultery with Jones, and on May 24, 1960, granted the appellee a divorce *a vinculo*, and, because the father was not then ready to receive and care for the child, awarded its custody to the mother "on a temporary basis pending an investigation and report by the Probation Department." No appeal was taken from the chancellor's findings relative to the dismissal of appellant's cross-bill, or the granting of a divorce to the appellee.

The Probation Department filed its report on August 9, 1960. We shall refer to it but briefly, because, due mainly to the crowded docket of the chancellor, the custody hearing was not held until sometime in October 1961, when considerable changes had occurred in the situations of the respective parties.

The report showed that the appellee married, on June 11, 1960, one Margaret Rogers, who is now about 30 years of age. Mrs. Rogers, a native of Maryland, had been deserted

by her first husband, and she had obtained a divorce from him in Baltimore. After graduating from high school, she completed two years of a three year nurse's training course, withdrawing voluntarily therefrom when she decided she did not want to become a nurse. She met the appellee while he was a patient in Johns Hopkins hospital for a back injury suffered in line of duty. The report stated: "The present Mrs. Insogna presented herself as a quiet spoken, sincere individual, who discussed the matter of custody in an intelligent manner, and seemed to have a genuine appreciation for the problems connected with a familial change in custody. She indicates that she is willing and anxious to care for the child in question if custody is granted the father." Concerning the appellee, the report shows that he is now about 31 years of age, and has been employed by the Baltimore County Police Department since February, 1953. The report stated: "Police Department sources report that Officer Insogna has a 'good record'; is of report in the community; and is on permanent station-house assignment because of injuries received in line of duty. A written report from * * * [his] former superior is * * * submitted with this report." The report further stated that several former neighbors of the parties had been interviewed and nothing of a derogatory nature had been revealed concerning either the father or the mother.

The report also stated that the appellant's work supervisor said she was "a nice person, well liked, good worker"; and that she said she left her husband primarily because of "his intense jealousy." The report was a factual one, and did not recommend to the court that custody be granted to either the father or the mother. More would be said concerning it but for the fact, mentioned above, that sometime after its filing, the chancellor held a hearing on the question of custody.

At the time of this hearing, the situations of the parties were, briefly, as follows. Jones and the appellant had continued their employment with Western Electric. The appellant stated that after the divorce she had, on the advice of counsel, stopped seeing Jones "socially," but did see him at work. However, beginning about in November of 1960, he turned over the exclusive use of his automobile to her for

some six months, and he rode the bus to work. In March of 1961, before his wife's divorce, Jones and she had purchased, in their joint names, a home, and she resided therein with her mother (now aged 69 and who is separated from her husband), and the child. During the last week of July, 1961, Jones's wife was granted a divorce. On August 4 following, the appellant married Jones, and he took up residence in the jointly purchased property with the appellant, her mother and the child. This property contains three bedrooms. Jones, who is now about 36 years of age, and the appellee earn approximately the same amount of money (some $400 a month take home pay). If granted custody of the child, the appellant intended to continue her employment (from which she derives about $55 a week) from four until twelve, and, when she was not at home, her mother would care for the child. This means, of course, that the appellant was living in a home with her mother, the child and her paramour, whom she had married just two months before the hearing.

The appellee and his present wife live in an apartment, containing two bedrooms, a living room, dining area, kitchen and bath. His wife was unemployed, and was available, and expressed her desire, to care for the child during the day as well as at night.

The child has been baptized a Catholic, and, will be reared as a Catholic, irrespective of whether the father or mother is granted custody.

The chancellor found that appellee's present wife was "an attractive young woman with good character and ability to raise a small child," and there was "no question about the adequacy of the physical facilities available for the child." Concerning the natural mother, the chancellor found that she "seems physically and mentally able to give the child the love and careful attention that the child needs and deserves and, ordinarily, she would be the favored custodian." The chancellor concluded, however, that under the facts of the case as they had developed the recent cases of *Hild v. Hild,* 221 Md. 349, 157 A. 2d 442, *Parker v. Parker,* 222 Md. 69, 158 A. 2d 607, and *Bray v. Bray,* 225 Md. 476, 171 A. 2d 500, were

controlling. He, therefore, awarded custody of the child to the father, with reasonable rights of visitation to the mother.

We agree. The natural father has been engaged in his present employment for some nine years. His home facilities are adequate for the child's needs. He has displayed a genuine paternal affection toward the child. His present wife, with her training as a nurse, her good character and her fondness for the child, offers every promise of rearing the child in a clean, wholesome and religious atmosphere. She is unemployed and will be able to care for the child at all times.

The natural mother's home is adequate for the child's needs. Living therein, however, are the mother, who has been found guilty of committing adultery, and her paramour, who deserted his former wife and three children and whom the chancellor found to be "very evasive" and one in whom he could "place little credibility" when under oath. The other member of the household is the appellant's sixty-nine year old mother, who is separated from her husband.

As indicated by the chancellor, it would be difficult, if not impossible, to distinguish this case from the *Hild, Parker* and *Bray* cases. We shall not repeat their facts in detail. In those cases, wives had committed adultery and, thereafter, married their paramours; each case involved a controversy between the natural parents as to the custody of a minor child. Following a long line of cases of this Court,[1] custody of the children was awarded to the fathers, they being fit and proper persons. After observing that the welfare of a child is the primary consideration in an award of its custody, the crux of the law upon the subject was aptly stated by Chief Judge Brune in *Parker* (222 Md. at page 75) when he said:

> "As is stated in the *Hild* case, there is no absolute and inflexible rule as to the award of custody of a child of divorced parents. Ordinarily, custody of a young and immature child is awarded to the mother, even though the father is without fault, if she is a fit and proper person to have custody of the child. This

---

1. They are listed in footnote 4 of the Hild case, 221 Md. at page 358.

rule will give way if it is demonstrated that the mother is not such a person. Usually, the fact that the mother has been guilty of adultery will be taken as indicating that she is not a proper person to have custody, and a strong showing must be made to overcome the usual rule or presumption against awarding custody to an adulterous mother."

The only "showing" the natural mother has made here is that she continued, after the divorce, in very close association with her paramour, and married him about a week after his wife had divorced him. As stated by Judge Horney in *Hild*, 221 Md. at page 358: "We think the past decisions of this Court require a strong showing to be made to overcome the usual rule against awarding custody to an adulterous mother. The fact that she subsequently marries the paramour has not been regarded as meeting the requirements of such a showing." See also *Mason v. Mason*, 228 Md. 387, 179 A. 2d 897, for a like ruling.

We have not attempted to define the term "strong showing," or to delineate just what a "strong showing" would require in any particular case, believing that each case must be determined upon its own facts and circumstances. In *Wood v. Wood*, 227 Md. 112, 175 A. 2d 573, we held that the wife had made such a showing, but the facts of that case have little resemblance to those involved herein.

*Decree affirmed; the appellee to pay the costs.*