## OBERLANDER *v.* OBERLANDER

[No. 274, September Term, 1969.]

*Decided February 6, 1970.*

The cause was argued before BARNES, FINAN, SING-LEY, SMITH and DIGGES, JJ.

*Peter R. Sherman,* with whom was *Barnard T. Welsh* on the brief, for appellant.

*Robert H. Symonds* for appellee.

BARNES, J., delivered the opinion of the Court.

The appellant Robert George Oberlander (Robert) challenges in this appeal the portion of the final decree of the Circuit Court for Montgomery County (Shure, J.) which, in a divorce suit divorcing the parties *a vinculo matrimonii,* awarded the custody of James Robert Oberlander (Jimmy), the infant son of Robert and the appellee, Catherine Frances Oberlander (Catherine), to Catherine. Robert also challenged the action of the trial court in refusing to entertain his motion, filed after the decree, to reduce child support payments of $40.00 a week on the ground that he was being inducted into the United States Army and his entire income would be less than the amount allowed for child support.

Robert and Catherine were married in June, 1964, while both were in high school, Robert being 19 years old and Catherine being 16 years of age. Jimmy was born three months later. At the time of the marriage, Robert was living with his parents, Mr. and Mrs. Howard George Oberlander, in Bethesda. Mr. Oberlander is treasurer for *U. S. News and World Report* in Washington and has been for some 23 years. He is also an elder in Bethesda Presbyterian Church. His oldest son is an accountant; his second son was, at the time of the hearing in the case, in training as a special agent of the Federal Bureau of Investigation. Mrs. Oberlander (Sylvia Waterhouse Oberlander) is not employed. At the invitation of Mr. and Mrs. Oberlander, Robert, Catherine and Jimmy moved into their house where the young couple and their infant son occupied a private part of the family home, including a bedroom, nursery and den. They lived there rent free and without the payment of expenses for food or other necessities so that both Robert and Catherine could complete their high school education and begin college programs with the financial assistance of Robert's parents. These arrangements were made necessary because neither Robert nor Catherine was working or had any money to support their family.

Problems arose in the marriage about the time Jimmy was born in September, 1964, and continued until Robert and Catherine stopped living together in August, 1967. Robert testified that these problems arose because of Catherine's failure to assume her responsibilities as a wife and mother in keeping their portion of the house clean and orderly and taking proper care of Jimmy, including not keeping him clean or feeding him. He stated also that Catherine was argumentative and surly. His testimony was substantially confirmed by the testimony of his mother, Mrs. Oberlander. Catherine, on the other hand, testified that the problems arose as the result of many arguments with her in-laws "based on just interference here and there, criticism from my mother-in-law on the way I handled things, the way I did things, and just a lot of childish bickering."

The parties separated in August, 1967, the trial court properly finding on the evidence that the separation was pursuant to a mutual agreement between the parties. Robert moved into an apartment in Montgomery County. Catherine; having lost her job, remained at the Oberlander home until about September 1 when she moved to her father's residence in Prince George's County.

For the first two weeks in September, 1967, Jimmy resided principally with Robert during the daytime hours and with Catherine in the evenings in accordance with an arrangement between the parties. About the middle of September after Catherine had moved to her father's home, Jimmy was visiting with her and was to be returned to Robert on a Friday evening. Catherine, however, did not return Jimmy, but took him in Mr. Oberlander's automobile and left for California without notifying Robert or his parents of her intentions. When she arrived in California, she moved in with her relatives there, sharing with Jimmy and two cousins a two bedroom apartment. Catherine testified that it was her intention to work, to continue to live under this arrangement until she had sufficient money to set up her own apartment. Catherine did not notify Robert where she

was, but approximately two weeks later about October 1, 1967, Robert learned that Catherine might be with her relatives in California. He then went to California and brought Jimmy back to Maryland.

Upon Robert's return to Maryland, he enrolled Jimmy in a nursery school and continued this during the two year period between then and the time of trial. Robert spent most of his daylight hours caring for his son; and when he went to work in the evenings, he either hired a baby sitter at his apartment or would take Jimmy to the home of his parents. Robert commenced religious training every Sunday for Jimmy at the Bethesda Presbyterian Church.

Catherine remained in California for some six months after Jimmy was returned to Maryland, having various jobs as a waitress in a restaurant, a Kelly Girl, and an Avon Sales Representative. She returned to Maryland on April 14, 1968, and moved in again with her father.

Without reviewing the rest of the testimony in detail, there was evidence from which the trial court could find, as it did, that there was no sufficient evidence to show that Catherine was an unfit mother, that she intended to leave Maryland and live elsewhere, or that she was guilty of immoral conduct. The trial court was impressed with Catherine's demeanor on the witness stand and concluded that she wanted to be a good mother to Jimmy. She had had experience in caring for young children in her own family from the time she was twelve years of age. He found that Robert lived in a studio apartment, and did not live in a home where there was a housekeeper. He commented upon the uncontroverted evidence that in Robert's photographic business he had taken pictures in his apartment of nudes which the trial court concluded was not "conducive to raising a young boy." It was the trial court's opinion that Catherine should be given a chance to be a mother to Jimmy and that she had changed from "an immature, confused and saddened child" to a mature 21 year old woman. He pointed out that under the decisions of this Court the usual practice,

established by experience, is to award custody to the mother in the absence of very unusual circumstances of which there were none in the instant case. He concluded that custody should be awarded to Catherine with reasonable visitation rights to Robert.

### (1)

It is clear to us that the trial court in awarding the custody of Jimmy to Catherine was considering the basic rule in custody cases, *i.e.*, that the best interests of the child determine the award of custody. *Krebs v. Krebs*, 255 Md. 264, 257 A. 2d 428 (1969); *Raible v. Raible*, 242 Md. 586, 219 A. 2d 777 (1966).

In determining what is the best interest of the child, it is entirely proper for the trial court to consider—as Judge Shure did—the general rule that the custody of a child of tender years should ordinarily be awarded to the mother. *Parker v. Parker*, 222 Md. 69, 158 A. 2d 607 (1960); *Hild v. Hild*, 221 Md. 349, 157 A. 2d 442 (1960); *Barnett v. Barnett*, 144 Md. 184, 125 A. 51 (1923). This is especially the case if it is not shown that the mother had committed adultery or is otherwise unfit to be a good mother to the child. Indeed, in the recent decisions of this Court a repentant mother who had previously committed adultery is not to be barred from receiving custody if the trial court finds that she is a fit mother at the time of trial and that it is for the best interest of the child under all the circumstances that custody be given to the mother. *Pratt v. Pratt*, 245 Md. 716, 228 A. 2d 611 (1967); *Cornwell v. Cornwell*, 244 Md. 674, 224 A. 2d 870 (1966).

We have observed that in the difficult and often distressing circumstances surrounding custody adjudications the trial court plays a vital role and the provisions of Maryland Rule 886 a, *i.e.*, that when a case has been tried by the lower court without a jury, the judgment of the lower court will not be set aside on the evidence *unless clearly erroneous* and due regard will be given to the opportunity of the lower court to judge the credibil-

ity of the witnesses, are especially important. *Raible v. Raible*, 242 Md. 586, 593, 219 A. 2d 777, 780 (1966), *supra; Andrews v. Andrews*, 242 Md. 143, 154, 218 A. 2d 194, 201 (1966) ; *Daubert v. Daubert*, 239 Md. 303, 309, 211 A. 2d 323, 327 (1965).

Upon this record, we are of the opinion that we cannot say that the findings of fact of the lower court were clearly erroneous or that the court was in error in awarding custody of Jimmy to his mother Catherine.

### (2)

When the lower court awarded $40.00 a week to Catherine for Jimmy's support, Robert had a gross monthly income of approximately $832.00 with a net monthly income of approximately $627.00. The testimony in regard to the needs of Catherine for Jimmy's support, in our opinion, justified the allowance of $40.00 a week in the decree of May 23, 1969. Robert entered an appeal from this decree on June 20, 1969.

On September 25, 1969, prior to the disposition of his appeal, Robert filed in the trial court a motion to modify the award of $40.00 a week alleging that on or about September 18, 1969, Robert was notified formally to report for induction into the United States Armed Forces on October 7, 1969. As a result, he alleged his civilian employment would terminate on or about October 3, 1969, and his earnings would be substantially less in the Army. He prayed that the $40.00 a week award be reduced as of October 1, 1969, to $100 a month.

Judge Shure instructed the assignment clerk: "Set nothing further before me on this case until appeal is disposed of," and Robert in his brief contended that this was an abuse of discretion on the part of the lower court. It is not necessary for us to pass upon this contention inasmuch as it was abandoned by counsel for Robert at the argument before us.

*Decree affirmed, the appellant to pay the costs.*