## GEORGE C. MULLINIX, SR. *v.* MARY E. MULLINIX

[No. 614, September Term, 1970.]

*Decided June 28, 1971.*

The cause was argued before MURPHY, C. J., and MOY-LAN and GILBERT, JJ.

*L. Robert Evans* for appellant.

*W. Lee Harrison* for appellee.

GILBERT, J., delivered the opinion of the Court.

This is an appeal from a decree of the Circuit Court for Baltimore County awarding a divorce *a vinculo matrimonii* to the Appellant on the ground of the Appellee's adultery, and the awarding of custody of the three minor children of the parties to the Appellee.

The Appellant asserts as error: (1) that the trial court was wrong in granting custody of the three minor sons to the Appellee in view of her adulterous conduct, (2) the granting of a counsel fee to the Appellee's attorney of $2500.00 in view of the Appellee's financial position and (3) in the Chancellor's advising certain witnesses of their right to claim their privilege against self-incrimination with respect to the crime of adultery and in failing to permit the Appellant's counsel to interject another alleged adulterous relationship not involving the parties hereto, but which he sought to show might possibly occur in the presence of the litigants' three minor children, and the trial court's making certain objections to the evidence *sua sponte.*

The parties hereto were married in a religious ceremony in Baltimore City on June 26, 1951. There were three sons born of the marriage who at the time of trial were respectively 15, 14 and 12 years of age.

A review of the transcript discloses that this marriage, almost from its inception, was like a volcano looking for a place to erupt. The arguments growing out of the marital discord often reached the point where they became physical conflicts. He had been cut by her and she struck and bruised by him. Twice he attempted suicide. Each of the parties described himself as a "social drinker" and each described the other as an "alcoholic." Mr. Mullinix was employed as the president of the Becker Pretzel Company, a concern owned by the wife's family, until it was destroyed by fire, and is now president of a similar concern in the midwestern part of the country.

In June of 1968 the Appellant filed a bill of complaint for a divorce *a mensa,* alleging that the wife had beaten him and had denied him conjugal rights. He further alleged that the Appellee was not a fit and proper person to have custody of the minor children. Appellee answered the complaint and filed a cross-bill alleging cruelty of treatment by the Appellant, *inter alia,* and praying for custody of the children. Thereafter, the parties continued to cohabit until March 24, 1969, when, after an increas-

ing number of violent episodes between them, the Appellee left the marital domicile and took with her the three children. A supplemental bill of complaint was filed by the Appellant on May 23, 1969, alleging desertion and again praying for custody of the minor children. To this bill an answer was filed, denying the allegations of the bill and asking that the same be dismissed. The Appellee set her *a mensa* bill [filed in 1968, *supra*] before a Master on the question of child support and the Appellant was ordered to pay the sum of $100.00 a week for the support and maintenance of the three minor children; the first payment to be made on May 20, 1969. On October 3, 1969 the Appellant filed his final bill of complaint repeating and realleging the substances of his previous complaints and further alleging adultery on the part of the Appellee. These allegations were denied. At the trial, adultery by Appellee with one James B. McCloskey was proven to the Chancellor's satisfaction and he granted the decree of divorce to the husband. No appeal has been taken from that portion of the decree.

Prior to trial the court ordered the parties to be seen by the court psychiatrist, Dr. Homer B. Martin. Significantly, the report concludes, "We can see no clear-cut advantage of either of these parents having custody of these three children."

A parade of witnesses testified as to the sobriety of the Appellant and the Appellee. Witnesses for the Appellant testified that he was the proper person to have custody of the children. Witnesses for the Appellee testified that she was the proper person to have custody of the children, notwithstanding any adulterous relationship on her part, because they said that if she was having an adulterous affair with McCloskey it was discreet and hidden from the children; it was not flaunted and her witnesses were unaware of it. The children testified, out of the presence of their parents, that they did not believe any adulterous relationship between their mother and McCloskey; that they thought they were no more than "good friends" and that basically they thought it

would be better they live with their mother and that the three boys should stay together. "And I think—well, my brothers think—we really want to live with my mother, they really don't want to say it, except Steve, I know he wants to live with my mother."

The oldest son stated, when pressed by Appellant's counsel, as to whether he would want to live with his mother if adultery was proven, "It would have some effect, but I can't make a decision, because —." When pressed further he replied that he didn't know. Insofar as the emotional well-being of all concerned, it was his thought that the boys should remain with the mother. He was unalterably opposed to a separation of the boys, that is, a splitting of custody by awarding one or two to one parent and the remainder to the other parent.

The second child testified he would like to live with his mother; that the most he could say existed between his mother and McCloskey was that they were friends and that he had never seen any indication of any misbehavior. He corroborated the oldest son's testimony. When he was asked by Appellant's attorney whether or not he told his father that if the mother were committing adultery he wanted to go with the father, his answer was "yes." He was then asked, "Is that still true?" to which he replied, "Yes; but I know they're not."

The youngest son simply indicated an unqualified preference to live with his mother.

The record indicates that it was the Appellee who attended the P.T.A. meetings and the school functions; who looked after the everyday care and welfare of her children; who saw that they were properly dressed, fed, housed and cared for and who took the children on vacations. Other than an occasional attendance at an athletic feat, the father's participation in the boys' social and scholastic activities was minimal. The Appellant apparently works hard and long hours in his present position. He testified that he lives in an apartment located in the plant where he is employed, but that if he were awarded custody of the children he would hire a house-

keeper and probably move his 75 year old mother to his new residence to care for the children. He would acquire a suitable house. His hours of employment range from 6:00 a.m. to 6:00 p.m. In addition to the main plant, he is responsible for two others; one 300 miles away; the other 20 miles. He must visit these plants. The one 300 miles away he should visit once a week.

He admitted that when he last visited Towson prior to the trial and requested visitation rights with the boys he took them to the attorney's office for an interview and then returned them to their home. He further admitted that for the last four or five years he did not take a vacation with them when their mother took them to Ocean City.

During the course of the trial, McCloskey, the paramour, admitted to a sexual relationship with the Appellee on two occasions, but denied any such activity after September of 1969, although he continued to see Mrs. Mullinix frequently at her home. In fact, he had a telephone in her house which was used in connection with his antique business and she had answered the phone for him. He further testified that some of his antiques, mostly furniture, were stored in her basement.

When the oldest son who was attending McDonogh School changed from a day student to a boarding student, the Appellant reduced the support payments from $100.00 a week to $66.00 a week. He did this, he says, on advice of counsel because his son was no longer living at home, and presumably because he was going to pay the board bill at McDonogh. As of the time of trial in May, 1970, however, the bill had not been paid.

While the court endeavored to prevent the exposure of the children to the sordid details, which we see no need to incorporate herein, it is of importance to note that their father (Appellant) read them excerpts from private investigator reports relative to their mother's adultery. He explained to them what "adultery" meant and stated in response to the court's question as to why he had done this: "I felt that by letting them know that I

was aware of what was going on, is that they would
loosen up and we could have a better time together, and
that there wasn't any secrets, or something of that na-
ture."

With this background, after a full and lengthy trial,
Judge Turnbull stated in his opinion from the bench:

> "Were it not for the problem involving Mr.
> McCloskey, even though the wife was guilty of
> adultery, I would have no problem in awarding
> her custody; I think she has been by and large
> a very good mother, that is my impression of
> her, that is certainly what I get from the nu-
> merous witnesses who have testified in that re-
> gard, the acquaintance of some of them with
> the Mullinixes going back for many years, and
> it is obvious that she looks out for the physical
> well-being of these boys; they are alert, well
> behaved, intelligent boys. I think these two peo-
> ple are very fortunate to have such well ad-
> justed children in the light of the turmoils which
> surrounded these children over a long period
> of time; and I am very, very much impressed
> with all three of these boys. The mother ob-
> viously takes good care of the boys; she looks
> out for their physical well-being * * *. But, in
> any event, she does take good care of the kids,
> of that I am convinced, and I find that as a mat-
> ter of fact, that she does so, with the excep-
> tion of the atmosphere created by McCloskey.
> I think, absent McCloskey, she is much better
> equipped to take care of the children than is
> her husband. His devotion to his boys is highly
> credible and commendable, * * *, I am per-
> suaded that the boys prefer to be with the
> mother, and I think they are old enough, in-
> telligent enough, mature enough so that their
> wishes should have great weight upon the
> Court, provided their wishes can be complied
> with under proper circumstances.

"There is no suggestion in this case that Mrs. Mullinix is a wanton woman, that she is promiscuous, that she is flagrant in adultery; the only thing with which she is flagrant is her continued association with McCloskey * * *.

"This is one of the most difficult cases I have had in over ten years in this position, and twenty-eight years before that as an active practitioner, and no matter what I do with the case I am still going to have a gnawing feeling that perhaps I am not right. But I find, gentlemen, under all the circumstances, that the custody should be awarded to the mother, with the specific, rigid provision that she must not at any time, in any way have anything to do with Mr. McCloskey, or he with her, of course; and the children shall in no way, at any time, at any place or under any circumstances, except by accident, passing him on the street, or something of that kind, be exposed to his company. Mrs. Mullinix, therefore, with that condition, and with that influence, and that aura removed from the household, is, in my opinion, the better equipped, and it is to the better interests of the children that she be granted custody. It will be her choice to make; if she is determined that she would rather have Mc-Closkey than the children I will accommodate her, because I will quickly move to take custody away from her, upon any properly presented evidence that she has failed to comply with this order."

We agree with Judge Turnbull.

The question of custody of children is a matter of particular concern to courts of equity. The rule to be applied in awarding custody is what is in the best interest of the children. *Kauten v. Kauten,* 257 Md. 10, 261 A. 2d 759 (1970) ; *Orndoff v. Orndoff,* 252 Md. 519, 250

A. 2d 627 (1969) ; *Shanbarker v. Dalton,* 251 Md. 252, 247 A. 2d 278 (1968) ; *Breault v. Breault,* 250 Md. 173, 242 A. 2d 116 (1968) ; *Sullivan v. Auslaender,* 12 Md. App. 1 (1971) ; *Widdoes v. Widdoes,* 12 Md. App. 225 (1971). The Court of Appeals, speaking through Judge Finan, in *Kauten v. Kauten, supra,* said:

> "While simple to state, application of the rule is often quite difficult for an appellate tribunal which has before it only the transcribed record. For this reason the court has established certain principles for better application of the legal standard to the facts at hand. For example it will be a rare occurrence when a young child will be taken from its mother if she is a fit person and all other things are equal. *Hild v. Hild,* 221 Md. 349, 357, 157 A. 2d 442 (1960). This is true even though the mother has been guilty of adultery. *Shanbarker v. Dalton, supra.* Another common principle is that a person who has committed adultery will have the burden of proving his fitness. *Insogna v. Insogna,* 229 Md. 33, 181 A. 2d 677 (1962), *Palmer v. Palmer,* 238 Md. 327, 207 A. 2d 481 (1965), and *Cornwell v. Cornwell,* 244 Md. 674, 224 A. 2d 870 (1966). Perhaps the most often applied rule of interpretation is that the chancellor's findings of fact should be given great weight since he had the parties, witnesses and child before him. *Holcomb v. Holcomb,* 255 Md. 86, 256 A. 2d 886 (1969), *Daubert v. Daubert,* 239 Md. 303, 211 A. 2d 323 (1965), and *Sibley v. Sibley,* 187 Md. 358, 50 A. 2d 128 (1946)."

Appellant cites to us *Pontorno v. Pontorno,* 257 Md. 576, 263 A. 2d 820 (1970), wherein custody was denied to an adulterous mother and there was no clear showing otherwise that she was a fit and proper person. The facts, however, in *Pontorno,* are quite dissimilar to those in this case. In *Pontorno,* the paramour lived in the same house as the wife and children and the children were led

to believe that the paramour was their father. Here, there is no such testimony. The Mullinix children have no identity problem. Certainly, they are not under the impression that the Appellee and McCloskey are more than good friends and they have been carefully sheltered from any other conclusion, except by the Appellant's misguided efforts to draw the children to him by reading excerpts from the investigation report. There was ample testimony, absent McCloskey, from which the Chancellor could conclude, as he did, that the Appellee is a fit and proper person to have custody. The answer to any question of future association with McCloskey has been sternly and rightfully spelled out in clear and unambiguous terms by Judge Turnbull. The Appellee knows the conditions upon which she has received custody and she knows that a deviation from the court's edict will lead to a revocation of that custody.

We are not unmindful of the Appellee's continued association with McCloskey throughout the trial and that her then continued relationship with him evidenced lack of repentance of her previous adultery. Unless there is a showing that she is a fit person to have custody it should not be awarded to her. *Pontorno, supra.* We think the Chancellor correctly found on the basis of the testimony that Appellee is a fit and proper person, her indiscretion with McCloskey notwithstanding. It must be borne in mind that the award of custody is not a prize to be handed by the court to the innocent or unerrant parent solely on the basis of his or her innocence or unerring ways. The controlling factor, as we have stated, is what disposition is in the best interests of the children. In *Kauten,* it was stated:

> "The legal standard to be applied in custody cases is quite clear, the best interest of the child being the determinative factor in making the award. *Orndoff v. Orndoff,* 252 Md. 519, 250 A. 2d 627 (1969) ; *Shanbarker v. Dalton,* 251 Md. 252; 247 A. 2d 278 (1968) ; *Breault v. Breault,* 250 Md. 173; 242 A. 2d 116 (1968)." [1]

1. For some other recent cases on issue of "Welfare of Child

Custody cases are like fingerprints because no two are exactly the same. That is why we must afford great weight to the Chancellor's opportunity to see and hear the witnesses, *Trudeau v. Trudeau,* 204 Md. 214, 218, 103 A. 2d 563 (1953), inasmuch as we are supplied with only the transcribed testimony. *Myers v. Butler,* 10 Md. App. 315 (1970).

We think that on the foundation of the Chancellor's decree prohibiting contact between the Appellee and her paramour, the strong testimony of her otherwise fitness to have custody, and the desire of the children, all of whom are intelligent and have reached the age of discretion, [*Sullivan v. Auslaender, supra*] to remain with the mother, that the trial court did not err in awarding custody to the Appellee.

The lower court has continuing jurisdiction over the award of custody and can change custody if a change in circumstances or conditions concerning the children's welfare warrants it. *Kauten v. Kauten, supra.*

For the reasons stated in *Sullivan v. Auslaender, supra,* we must exercise our best judgment in determining whether the conclusion reached by the Chancellor as to the custody on the facts is in the best interest, benefit and welfare of the children. This court recently decided *Widdoes v. Widdoes, supra.* In *Widdoes,* the husband was divorced *a vinculo matrimonii* from his wife on the ground of the wife's adultery. After holding the matter of custody sub-curia for some months, the trial judge awarded custody to the father of the 7 year old boy. Custody of an older son, age 16, was not in dispute; a 72 year old aunt took care of him. We affirmed that portion

---

Governing" see: *Snow v. Watson,* 240 Md. 712, 213 A. 2d 748 (1965); *Heaver v. Bradley,* 244 Md. 233, 223 A. 2d 568 (1966); *Ouellette v. Ouellette,* 246 Md. 604, 229 A. 2d 129 (1967); *Fanning v. Warfield,* 252 Md. 18, 248 A. 2d 870 (1969); *Krebs v. Krebs,* 255 Md. 264, 257 A. 2d 428 (1969); *Oberlander v. Oberlander,* 256 Md. 672, 261 A. 2d 727 (1970); *Neuwiller v. Neuwiller,* 257 Md. 285, 262 A. 2d 736 (1970); *Goldschmiedt v. Goldschmiedt,* 258 Md. 22, 265 A. 2d 264 (1970); *Hall v. Triche,* 258 Md. 385, 266 A. 2d 20 (1970).

of the decree awarding a divorce *a vinculo matrimonii*, and remanded without affirmance or reversal the cause for further proceedings on the question of custody. There, however, it was obvious from the remarks of the trial judge in reaching his conclusion concerning custody that he did not expressly find the father to be a fit custodian. In the instant case, Judge Turnbull has expressly found Mrs. Mullinix to be a fit and proper person to have custody, provided she no longer associates with McCloskey. Appellee argues to us the dictum in *Orndoff v. Orndoff, supra*. In *Orndoff*, the Appellant-father attempted to show an illicit relationship on the part of the Appellee-mother by producing testimony that the Appellee and a person named as her paramour had continued to see each other subsequent to the divorce. On one occasion the alleged paramour was seen to have entered the mother's home at approximately 4:00 a.m. and the lights were put out a few minutes later. The Court of Appeals, after finding that the evidence relative to the adulterous conduct was "conflicting and unpersuasive" then concluded its opinion by saying:

> "Even if the Appellant had established illicit conduct on the Appellee's part, we cannot say under the circumstances presented in this case that the lower court erred in dismissing Appellant's petition."

In *Widdoes*, Judge Orth, commenting on *Orndoff*, said:

> "While this dictum could be deemed an indication that the rigors of the established rule may be relaxed by the Court of Appeals in some future case, it has not as yet been applied; we feel obliged to follow the established rule. We find that Appellant did not make a clear showing rebutting the presumption that she is an unfit person to have custody of Gerald at the time the custody order was passed by the lower court."

In the instant case we find on the record before us that the Appellee has made a clear showing that she was a fit person to have custody of the children at the time the order was passed by Judge Turnbull and that the award of custody to the Appellee was in the best interest, welfare and benefit of the children. We do not believe on the record before us that the Appellant has shown that he would be in a position to properly care for and supervise the children. He is dedicated to his job and works long, hard hours to achieve business success. The children may be placed under the care of a 75 year old grandmother and an unidentified housekeeper to be hired in a house to be acquired and the exact locale to be decided upon. The father, because of his work, would be less able to provide necessary parental supervision to the children. Appellant's plans concerning his children were at the best nebulous.[2]

Appellant next attacks the award of counsel fee to the Appellee's attorney in the amount of $2500.00. The testimony revealed that the Appellee had an income of approximately $10,000 per year and assets of roughly $200,000. Appellant's income is nearly $50,000 per year. In regard to the matter of the fee Judge Turnbull said, "* * * I think Mr. Mullinix should be required to make a contribution of $2500 toward the fee for Mrs. Mullinix * * *."

The Court of Appeals in *Lopez v. Lopez*, 206 Md. 509, 520-521, 112 A. 2d 466 (1955), held:

"In determining the amount of the counsel fee to be paid by the husband to the wife's solicitor, the court should take into consideration

---

2. A substantial change in the custody law has been made by the legislature, Chap. 708, Acts of 1971, adding § 66 (g) to Article 16. In substance the new chapter provides that any child 16 years of age or older who is subject to a court custody decree may petition the court to amend the decree and the court shall hold further hearings and may amend the decree and place the child in the custody of the parent designated by the child. The child is authorized to institute the proceeding on his own without joining a guardian ad litem or next friend.

the financial circumstances of the parties, and determine the amount in accordance with the wife's necessities and the husband's financial ability, and allow an amount that will afford the wife an efficient presentation of her side of the controversy. As in the case of alimony, the amount of the award is within the discretion of the chancellor and, while his discretion is subject to review by the Court of Appeals, the award should not be disturbed unless his discretion was exercised arbitrarily or his judgment was clearly wrong. *Bennett v. Bennett,* 197 Md. 408, 416; 79 A. 2d 513."

See also the case of *Stewart v. Stewart,* 256 Md. 272, 283, 260 A. 2d 71, 76 (1969), wherein it is stated:

"Competent trial lawyers know that if a case is well-prepared and well-tried it may be likened to an iceberg. A very small portion of an iceberg appears above the surface of the water. Many hours are spent prior to actual court appearance in a case, particularly in a domestic relations case which is bitterly contested * * *."

The record discloses that this case was bitterly contested and encompassed five days of actual trial. A number of pleadings and depositions were involved. It is evident that a considerable amount of time and work was devoted to this case by counsel for the Appellee. We do not think the Chancellor abused his discretion in an award of $2500 counsel fee as a contribution toward the wife's attorney's fee, nor do we think his judgment was clearly wrong. *Lopez v. Lopez, supra.*

Appellant also objects to the trial judge's advising witnesses of their right to claim privilege against self-incrimination.[3] Adultery is a crime in Maryland.[4] Article 22 of the Declaration of Rights provides:

---

3. Appellee declined to answer after being advised by her then counsel of her constitutional rights.

4. Article 27, § 4, provides for a fine of $10.00 on conviction of adultery.

416

"No man ought to be compelled to give evidence against himself in a criminal case."

The instant case, of course, is not criminal in nature. However, the questions propounded by the Appellant's attorney to these witnesses concerning whether or not they had had relations with a person of the opposite sex, not their spouse, if answered affirmatively would have constituted an admission to the commission of the crime of adultery and could have been used against them in a criminal proceeding. No statutory authority exists in this state providing immunity from prosecution for admission of this criminal offense in this civil proceeding.[5]

Appellant refers to us the cases of *Forrester v. State,* 224 Md. 337, 167 A. 2d 878 (1961), and *Adams v. State,* 200 Md. 133, 88 A. 2d 556 (1952), wherein the Court of Appeals said:

"We have held, however, that it is not obligatory for the court to inform a witness of such right. *Raymond v. State,* ex rel. *Younkins,* 195 Md. 126, 129-130, 72 A. 2d 711, 712. See also *Blum v. State,* 94 Md. 375, 382, 51 A. 26, 56 L.R.A. 322. The right, where it exists, is personal to the witness and neither the prosecution nor the accused has a right to object."

These cases, however, do not prohibit a trial court from advising the witness of his or her right to decline to testify on the constitutional grounds. They merely impose no duty on the trial judge to do so. Cf. *Wharton's Criminal Evidence,* Vol. 3, 12th Ed. § 722.[6] We cannot sub-

---

**5.** However, Maryland Rule 628 dealing with Supplementary Proceedings provides that a witness "* * * shall not be excused from answering any questions on the ground that such examination will tend to connect him with the commission of fraud. His answers shall not be used as evidence against such person in any criminal proceeding based upon such fraud."

**6.** *Wharton* says in § 722: "In some jurisdictions, neither the trial judge nor the prosecution is required to warn or notify an ordinary witness or the defendant of his privilege against self-incrimination. In such jurisdictions, the trial judge may in his discretion so inform the witness or defendant, and some regard it as the better practice for the trial judge to do so."

scribe to the Appellant's argument that the criminal offense of adultery is so minor that "not only need the witness not be advised by the court, but that the court *should not* advise the witness of his privilege against self-incrimination. * * *."

We find no authority for this bald assertion, nor do we find that the constitutional right to protection from self-incrimination is proportionate to the gravity of the offense. The Chancellor did not err in advising witnesses of their right to claim the privilege against self-incrimination.

The Appellant called the Appellee's brother, David Becker, as a witness and interrogated him concerning a relationship he either had or may have had with a Miss Magregor. Appellant contends he was attempting to develop another adulterous relationship in Mrs. Mullinix's home and its resultant adverse effect on the children. Becker testified that he and Miss Magregor were "acquaintances" and that he never committed adultery in Mrs. Mullinix's household. He acknowledged that the children knew Miss Magregor. The trial court would not allow Appellant's attorney to explore Becker's relationship with Magregor outside the Mullinix house. Mrs. Mullinix cannot be held responsible for her brother's conduct whatever it may be. There was absolutely no evidence that the children were exposed to any acts of misconduct of the brother, if, in fact, any such acts occurred. Becker exercised his constitutional rights and declined to answer a series of questions concerning his relationship with Magregor. In *3 Nelson, Divorce and Annulment,* 2nd Ed., 1945, Chap. 25, § 26.18, it is stated:

> "Admissibility of evidence in divorce suits is governed by the usual rules. The court has a good deal of discretion as to relevancy and materiality in borderline situations. * * *.

> "Materiality and relevancy are to be determined in the light of the pleadings and the evidence should not be permitted to go far afield * * *."

We recognize that in examination of witnesses the court should give considerable latitude to counsel in the presentation of his case in the manner which he deems most effective. Such presentation must of necessity be subject to the control of the trial court. *58 Am. Jur.* § 565. However, even if an adulterous relationship between Becker and Magregor were shown to exist outside of the Mullinix home, we fail to see that it would alter the findings. Refusal to allow the testimony, if error, was harmless.

Appellant next contends that the trial court erred in sustaining an objection *sua sponte* to a question put to McCloskey, which was, "In your view, is it moral to have sexual intercourse with a married woman?" McCloskey's opinion would be questionable as to any evidentiary value. He admitted he had sexual relations with the Appellee. The trial judge refused to hear McCloskey's theory on the moral aspects of the matter. Judge Turnbull's ruling, if in error, was harmless. The lower court has, by its decree above quoted, completely removed the aura of McCloskey from Mrs. Mullinix's home.

*Decree affirmed.*
*Costs to be paid by appellant.*