JOAN M. KIRSTUKAS *v.* EDWIN KIRSTUKAS

[No. 316, September Term, 1971.]

*Decided January 31, 1972.*

The cause was argued before MORTON, ORTH and MOY-LAN, JJ.

*Allen D. Greif,* with whom were *David Cohen* and *Greif, Cohen & Alpert* on the brief, for appellant.

*Norman F. Summers,* with whom was *Julian S. Brewer, Jr.,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

A decree of divorce a vinculo matrimonii granted by Judge J. Gilbert Prendergast in the Circuit Court for Baltimore City terminated the marital discord between

Joan Kirstukas, the appellant (Wife), and Edwin Kirstukas, the appellee (Husband). It could not dissipate the discord over the custody of the three minor children of that marriage, which custody is the subject of this appeal.

The Husband and Wife were married on September 18, 1959. The three children of that marriage were, at the time of trial, respectively, a ten-year-old son, a nine-year-old daughter, and a five-year-old daughter. The Wife had a fourteen-year-old daughter from a previous marriage. The Husband and Wife physically separated on January 18, 1969. The Wife filed for a divorce a mensa et thoro, charging constructive desertion. The Husband filed a cross bill for divorce a mensa et thoro, charging actual desertion. The Wife subsequently filed a supplemental bill for a divorce a vinculo matrimonii, charging that the constructive desertion had then persisted for an uninterrupted period of eighteen months. The Husband filed a supplemental cross bill for divorce a vinculo matrimonii, charging that the actual desertion had then persisted for an uninterrupted period of eighteen months. Both Husband and Wife sought the award of permanent care and custody of their three minor children. At the conclusion of the strenuously-contested trial, Judge Prendergast dismissed the Wife's bill and granted a divorce a vinculo matrimonii to the Husband on the grounds of actual desertion. He deferred ruling on the subject of custody, pending the opportunity to talk in chambers to the children.

On March 19, 1971, Judge Prendergast filed the formal decree, granting the divorce to the Husband and also awarding him the custody of the three children. Incorporated as part of the record is Judge Prendergast's letter to counsel for both parties of March 12, 1971, explaining his reasons for his decision on the question of custody. It reads, in pertinent part:

"At the suggestion of counsel, the question of custody of the three children was deferred un-

til the court should have the opportunity to interview them in chambers several days later. This has been done, and as the result I have concluded that the disturbing question of custody must be resolved so that the custody of all three children must be awarded the father, Edwin Kirstukas, subject to the further order of the court. It may well be noted that this conclusion is supported by the rather thorough investigation conducted by a representative of the Adoption and Custody Division of the Department of Juvenile Services, who testified at the trial.

In all divorce cases where the parties have children, the real losers generally are the children. I am satisfied that all three of these young people need and would like to have the company of both parents at all times but, unfortunately, Mrs. Kirstukas has left their home and refuses to return. Her activities are such that she has not been able to care for the children as well as she could and, I am sure, would do if she had remained at home. Mrs. Kirstukas has been in the past a good mother to the children and I believe they are devoted to her, but they are far happier with their father, who has managed to make provision for their upbringing, support and education, which I think is superior to that which they enjoy at present."

The Wife does not contest the granting of the divorce to her former Husband. She does contest, most strenuously, the awarding to him of the custody of the three children.

In *Sullivan v. Auslaender*, 12 Md. App. 1, 3-5, we clearly articulated the standard to be employed in reviewing an award of custody by the lower court. We do not "consider the conclusion of the chancellor within the ambit of the clearly erroneous rule, Maryland Rule 1086." We rather exercise our "own sound judgment in deter-

mining whether the conclusion the chancellor reached was the best one." Upon a thorough review of the entire record, it is our judgment that the conclusion reached by the chancellor was the best one.

Involved here is the interplay of two long-settled principles of law, and the question of whether those principles conflict or complement. The first, as enunciated in *Hild v. Hild,* 221 Md. 349, 357, is that:

> "Since the mother is the natural custodian of the young and immature, custody is ordinarily awarded to her, at least temporarily, in legal contests between parents when other things are equal, even when the father is without fault, provided the mother is a fit and proper person to have custody."

See also 2 Nelson, *Divorce and Annulment,* Section 15.09 (2d ed., 1945) ; *Kauten v. Kauten,* 257 Md. 10; *Oberlander v. Oberlander,* 256 Md. 672; *Cornwell v. Cornwell,* 244 Md. 674; *Palmer v. Palmer,* 238 Md. 327; *Sellman v. Sellman,* 236 Md. 1; *Wallis v. Wallis,* 235 Md. 33; *Parker v. Parker,* 222 Md. 69; *Oliver v. Oliver,* 217 Md. 222; *Roussey v. Roussey,* 210 Md. 261; *Townsend v. Townsend,* 205 Md. 591; *Trudeau v. Trudeau,* 204 Md. 214; *Porter v. Porter,* 168 Md. 296; *Barnett v. Barnett,* 144 Md. 184; *Levering v. Levering,* 16 Md. 213; *Mullinix v. Mullinix,* 12 Md. App. 402; *Widdoes v. Widdoes,* 12 Md. App. 225; *Myers v. Butler,* 10 Md. App. 315.

The Wife seeks legal solace in the fact that Judge Prendergast referred to her as one who has been "in the past a good mother to the children" and did not pronounce her "unfit." In view of the clear ruling of Judge Prendergast, amply supported by the evidence, that the Husband was better able to serve the interests of their children, the Wife makes too much of what appears to have been an obiter act of verbal generosity—a softening of the blow—a touch of judicial gallantry. Seizing upon the not unfavorable language, however, she urges that it brings her within the compass of "a fit and proper

person to have custody." She looks to the principle as operating in a vacuum and urges the absolute proposition that a "not unfit" mother should never be separated from her children.

The above-stated principle does not operate in a vacuum, however. It is correlative of and ancillary to another long-settled and, indeed, paramount principle, also enunciated in *Hild v. Hild, supra,* at 357, to the effect that:

> ". . .modern courts invariably hold that the best interests and welfare of the child should be primarily considered in making an award of custody."

See also *Hall v. Triche,* 258 Md. 385, 386; *Goldschmiedt v. Goldschmiedt,* 258 Md. 22, 25; *Krebs v. Krebs,* 255 Md. 264, 266; *Fanning v. Warfield,* 252 Md. 18, 24; *Shanbarker v. Dalton,* 251 Md. 252, 257; *Heaver v. Bradley,* 244 Md. 233, 242; *Snow v. Watson,* 240 Md. 712, 713; *Mullinix v. Mullinix, supra; Widdoes v. Widdoes, supra; Myers v. Butler, supra.* That this is the paramount consideration is clear. "Of course, it is too elementary to be stressed that the welfare of the child is the controlling test in a custody case." *Butler v. Perry,* 210 Md. 332, 342, citing *Burns v. Bines,* 189 Md. 157, and *Stimis v. Stimis,* 186 Md. 489. The superior role assigned to this criterion was well summarized in *Sullivan v. Auslaender, supra,* p. 3, n. 2:

> "That securing the welfare and promoting the best interest of the child is decisive is emphasized by the various other ways reference is made to that 'clean and well defined' requirement. It was stated to be the 'paramount question' in *Piotrowski v. State,* 179 Md. 377, 381; the 'sole question' in *Young v. Weaver,* 185 Md. 328, 331; the 'paramount consideration' in *Glick v. Glick,* 232 Md. 244, 248; the 'determining factor' in *Heaver v. Bradley, supra,* at 242; the

'ultimate test' in *Fanning v. Warfield, supra,* at 24; 'of transcendent importance' in *Dietrich v. Anderson,* 185 Md. 103, 116."

A surface reading of the Wife's argument would make it appear that these two principles of equity jurisprudence are in collision. They are not. The first principle is a statement of one of the weighty factors that needs be considered in the weighing operation contemplated by the second principle. The so-called "preference" for the mother as the custodian particularly of younger children is simply a recognition by the law, as well as by the commonality of man, of the universal verity that the maternal tie is so primordial that it should not lightly be severed or attenuated. The appreciation of this visceral bond between mother and child will always be placed upon the balance scales and, all else being equal or nearly so, will tilt them. As heavy a factor as it may be, however, it is still but a factor. Every statement of the preference is hedged about by the context, "all else being equal." If, after giving due weight to the maternal preference, the scales nonetheless demonstrate the better suitability of the father or, indeed, of some third person to serve the interests of the child, the path for the chancellor is clearly indicated. The "better interests" of the child is always the paramount consideration. In Nelson, *Divorce and Annulment,* (2d ed., 1945), Section 15.09, "Mother favored by law," oft-quoted by the Maryland decisions, concludes:

"However, the rule that a mother should be given preference in awarding the custody of her children is not inflexible, nor is the mother entitled to the custody of a daughter as a matter of law, the welfare of the child being paramount, the preference in favor of the mother of young children being resorted to merely to aid the court to determine what is for the best interests of the children. Under some circumstances the best interests of children will be

served by giving their custody to their father or some other person, even though the children are of tender age, or girls, and the mother is a morally fit person for the trust. Thus, the general rule that a mother should be awarded the custody of her children is modified in special cases in order to give precedence to the rule that the paramount consideration is the welfare of the child."

Our judgment, upon a review of the entire record and taking all factors into consideration, including the normal preference for the mother, is, as was that of Judge Prendergast, that the interests of these children will better be served by awarding their custody to their father. The difficulty that led to the ultimate break-up of this home was the strong inclination of the mother here, manifested for over a year prior to the physical separation, to seek a social life of her own in bars and dance halls. The testimony established that this wife would go regularly, in the company of girlfriends who were themselves divorced or separated from their husbands, to bars, particularly The Patapsco Inn, and would remain there, seeking out or accepting male companionship, until the wee hours of the morning. When she first began to engage in this course of conduct, she would return home at approximately 1 a.m. In the months immediately preceding the physical separation, the hour of return was frequently as late at 4 a.m. She expressed to a psychiatrist the felt need "to go out and dance." Her brother, who for a part of the period of marital difficulty worked as a part-time bartender at The Patapsco Inn, described it as "a pick-up joint" and described his sister as frequently dancing with and associating with men other than her husband. The testimony is equally clear that, after the separation, the Wife's pursuit of this social life of her own continued unabated. Private detectives observed her leaving her home with other men in mid evening and testified that she, on several occasions, had not

returned to the home when the surveillances were discontinued at hours ranging between 3 a.m. and 4:30 a.m.

The Wife worked during the day. She took supplemental jobs at night which kept her regularly from her home. One of those supplemental jobs was as the booking agent for "go-go girls", in which capacity she would have to travel with the girls to various nightclubs in the metropolitan area. She, to be sure, never left her children unattended. Sometimes she left them with her sister. Sometimes she left them with a tenant. Most frequently, she left them with her daughter by her first marriage, Denise. It is clear that the major burden of raising the three younger children fell upon the teenaged half-sister, both in the afternoon hours and in the evening hours. It is equally clear that Denise resented this burden and resented her mother for thrusting it upon her. She testified that if the custody of the three younger children were awarded to the Wife, she (Denise) would leave the home and go to live with her natural father.

The very thorough report of the Adoption and Custody Investigator recommended strongly that custody be awarded to the father. That report concluded, in pertinent part:

> "The type of care that Mrs. Kirstukas provides is not what is so much questioned as is the time she spends with them and the importance to her of her role as a mother. Mrs. Kirstukas' interests seem to be primarily outside of her family life. As a result she seems to spend little time with her children. Hence these children seem to be two time losers, deprived of both parents. Mr. Kirstukas has indicated his desire to fill the void he feels has been created in their lives. He wants to give the children his home, his time and his love. He claims he never would have tried to take the children from their mother had she been a mother to them. He feels she has not. Mr. Kirstukas is of the opinion that his wife

does not know what she wants. Shortly after their separation he persuaded her to go with him to a psychiatrist. The diagnosis was 'Emotionally unstable personality.' Obviously Mrs. Kirstukas is still trying to find what she wants. Her children seem to be suffering. To remove such young children from their mother's care is a very serious course of action. In view of the amount of time Mrs. Kirstukas is reported to be away one wonders how difficult the adjustment would be. This investigator feels that the security offered them by their father's presence, the love given them through his attention could make this transition a worthwhile one for them."

The testimony of the Wife's own brother was that his nephew and nieces would be better off with their father. The report of the Adoption and Custody Investigator also indicated that the oldest of the three children, albeit making a selection with great reluctance, indicated a strong preference for the father's home and also indicated that his nine-year-old sister felt the same way. The nine-year-old sister simply could not voice a preference to the investigator. The evidence also established that during the two years between the physical separation and the trial of the case, the mother, with her children in tow, had been in three separate residences, each move requiring a corresponding shift in the schools being attended by the school-aged children.

Indicative of the Wife's strong proclivity for pursuing a social life of her own, even at the expense of depriving her children of those hours of maternal companionship, were two remarks she made, one to her former husband and one to her former sister-in-law. The sister-in-law recounted an effort to persuade the Wife to return to the home and effect a reconciliation. She described the Wife's response:

"Well, she told me that she no longer loved my

brother, and that she would never go back to him, because she no longer loved him, and I even made the remark, if she would try for the sake of the children, and she said that from now on she was going to come first."

The Husband described her response to his effort, on another occasion, to effect a reconciliation:

"She said, 'I don't give a damn about you or the kids. I'm going to worry about myself.'"

Due consideration was given to the maternal tie as a strong factor in the ultimate equation. Notwithstanding its presence, the scales tilted the other way. The Wife protests that no such comparison can be made between her and her former husband, just so long as she herself is above the minimal threshold of "fitness." Such is not the state of the law.

We concur with Judge Prendergast that the Father here would better serve the interests of the children.

The Wife raises the additional contention that the award of $200 by the chancellor as a contribution by the Husband toward the payment of her counsel fees was inadequate. She argues as to the time and expenses involved in the prosecution of this appeal. Since the award of the chancellor was only for the trial of the case, all consideration of the appellate effort is irrelevant. The Wife's income was shown to be, on her combined salaries, in excess of $200 per week. Article 16, Sec. 5(a), reads:

"In all cases. . .the Court shall not award such . . .counsel fees unless it shall appear from the evidence that the wife's income is insufficient to care for her needs."

We cannot say that the chancellor was wrong in the award he made. We do not deprecate the very competent effort made by counsel for the Wife here. We only emphasize that the award of the chancellor was for a "con-

tribution" to the payment of the fee and not an evaluation of what that fee appropriately should be.

*Decree affirmed; costs to be paid by appellant.*